UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------X
ROBERT TORTORA,

PLAINTIFF,

-against-          Case No.:
15-CV-3717
(MKB)(VMS)

CITY OF NEW YORK, POLICE DETECTIVE MALCOLM
DANZIGER, POLICE OFFICER TIMOTHY DONNELLY,
POLICE OFFICER JOHN/JANE DOE(S) #'S 1-3,

DEFENDANTS.
------------------------------------------X

DATE: October 27, 2017
TIME: 10:40 A.M.

DEPOSITION of the Defendant,
CITY OF NEW YORK, by a witness,
RHIANNON LA TOUR, ESQ.., taken by the
respective parties, pursuant to a Court
Order and to the Federal Rules of Civil
Procedure, held at the offices of Diamond
Reporting, Inc., 16 Court Street, Suite 907,
Brooklyn, New York 11241, before, Germila
Donald, a Notary Public of the State of New
York.

APPEARANCES:

NASS & ROPER LAW, LLP
    Attorneys for the Plaintiff
    ROBERT TORTORA
    14 Penn Plaza, Suite 2004
    Manhattan, New York 10123
    BY: DAVID ZELMAN, ESQ. of Counsel

ZACHARY W. CARTER, ESQ.
CORPORATION COUNSEL
NEW YORK CITY LAW DEPARTMENT
    Attorneys for the Defendants
    CITY OF NEW YORK,
    POLICE DETECTIVE MALCOLM DANZIGER,
    POLICE OFFICER TIMOTHY DONNELLY,
    POLICE OFFICER JOHN/JANE DOE(S)
    #'S 1-3
    100 Church Street
    New York, New York 10007
    BY: CHERIE N. BROWN, ESQ.
    CHEBROWN@LAW.NYC.GOV

OFFICE OF THE DISTRICT ATTORNEY
RICHMOND COUNTY
ASSISTANT DISTRICT ATTORNEY
DEPUTY CHIEF, APPEALS BUREAU
    Attorneys for the Defendant
    RHIANNON LA TOUR, ESQ.
    130 Stuyvesant Place
    Staten Island, New York 10301
    BY: ANNE GRADY, ESQ.
    anne.grady@rcda.nyc.gov

*   *   *

F E D E R A L   S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by
and between the counsel for the respective
parties herein that the sealing, filing and
certification of the within deposition be
waived; that the original of the deposition
may be signed and sworn to by the witness
before anyone authorized to administer an
oath, with the same effect as if signed
before a Judge of the Court; that an
unsigned copy of the deposition may be used
with the same force and effect as if signed
by the witness, 30 days after service of the
original & 1 copy of same upon counsel for
the witness.

IT IS FURTHER STIPULATED AND AGREED
that all objections except as to form, are
reserved to the time of trial.

*   *   *   *

R. LA TOUR, ESQ.
R H I A N N O N  L A  T O U R , E S Q, called
as a witness, having been first duly sworn
by a Notary Public of the State of New York,
was examined and testified as follows:
EXAMINATION BY
MR. ZELMAN:
        Q.  Please state your name for the
record.
        A.  Rhiannon La Tour, Esq.
        Q.  Where is your place of business?
        A.  Office of the District Attorney,
Richmond County, 130 Stuyvesant Place,
Staten Island, New York 10301.
        Q.  Good morning, Ms. La Tour.  First
name?
        A.  Good morning.  R-H-I-A-N-N-O-N,
Rhiannon.
        Q.  Good morning.  My name is
David Zelman.  I am the attorney for Robert
Tortora in a federal case pending in the
Eastern District of New York.  We were
informed that you were the ADA assigned to a
case called People versus Tortora back in, I
believe it was in 2015.

R. LA TOUR, ESQ.

1      R. LA TOUR, ESQ.
2      A.  2014.
3      Q.  Thank you.  I will ask you some
4   questions about that.  And as you know, your
5   testimony is under oath?
6      A.  Yes.
7      Q.  How long have you been with
8   Richmond County DA's office?
9      A.  Since February of 2009.
10     Q.  And from 2009 to 2014, did you
11  have many different functions there or were
12  you assigned to the one particular role?
13     A.  I had a few roles.
14     Q.  The role that you were assigned to
15  in 2014, were you in that role for the
16  entire calendar year?
17     A.  No.
18     Q.  What was the role that you had in
19  April of 2014?
20     A.  I was the line assistant in the
21  Special Victims Bureau.
22     Q.  Okay.  How long did you have that
23  role?
24     A.  From October of 2010 until I
25  believe March of 2016.

1      R. LA TOUR, ESQ.
2      Q.  So were you a line assistant when
3   you were involved in the prosecution of Mr.
4   Tortora?
5      A.  Yes.
6      Q.  Tell us what does the line
7   assistant do, day-to-day operation.
8      A.  Handle cases.  Prosecuting cases.
9      Q.  Does that mean you were assigned
10  to specific cases?
11     A.  Yes.
12     Q.  And is it any specific type of
13  case that you would get as a line assistant?
14     A.  In the Special Victims Bureau, I
15  would receive any case falling within that
16  category.  Some misdemeanors, some felonies.
17  In that category would include domestic
18  violence cases, as well as felonies against
19  children, as well as sex assault cases.
20     Q.  Okay.  Now, is it true that you
21  were assigned to the Tortora case because it
22  had some relevance to domestic violence?
23         MS. BROWN:  Objection.  Go ahead.
24     A.  I was assigned to the Tortora case
25  because I had previous involvement with

1      R. LA TOUR, ESQ.
2   Tricia Curulli.
3      Q.  What was that previous
4   involvement?
5      A.  I was assigned to prosecute a case
6   against Vincent Curulli where Tricia Curulli
7   was the victim.
8      Q.  And what year was that?
9      A.  I believe also 2014.
10     Q.  Is that how you met Tricia
11  Curulli?
12     A.  Yes.
13     Q.  Then, this new case comes up and
14  why is it assigned to you, if you know?
15     A.  I don't know.  Because I did not
16  assign it.
17     Q.  Okay.  But you said -- is it the
18  custom or practice of the District
19  Attorney's office to assign you a second
20  case if you have already quote unquote
21  already represented the client on a prior
22  case?
23         MS. BROWN:  Objection.
24         MS. GRADY:  Objection.
25     A.  Yes.

1      R. LA TOUR, ESQ.
2      Q.  With respect to that prior case,
3   can you tell us the sum and substance of
4   that case?  You said "assault case" is that
5   what it was?
6         MS. GRADY:  Can you repeat the
7      question?
8         MS. BROWN:  Can you repeat
9      question?
10        (Whereupon, the referred-to
11     question was read back by the
12     reporter.)
13        THE WITNESS:  Do you want me to
14     answer?
15        MS. BROWN:  Yes.
16     A.  I did not say what kind of case it
17  was.
18     Q.  Was it an assault case?
19     A.  Yes, it was.
20     Q.  What was the outcome of that case?
21     A.  I don't know.
22     Q.  Did it not go to trial?
23     A.  I don't know.
24     Q.  Were you assigned to that case
25  throughout the whole case?

R. LA TOUR, ESQ.

1         R. LA TOUR, ESQ.
2   A. I was not.
3   Q. How much involvement did you have
4 in that case, days, weeks, months?
5   A. I don't know exactly how long.
6   Q. Is there a reason that you were
7 stopped in the middle of that case?
8   A. I went on leave.
9   Q. When were you on leave?
10   A. I left for a planned leave in
11 August of 2014.
12   Q. To when?
13   A. February of 2015.
14   Q. So with respect to this case
15 against Mr. Tortora, what is the first
16 information that you got and from what
17 source?
18     MS. BROWN: Objection. Just for
19     clarification, I will say objection,
20     you can still answer the question
21     unless I direct you not to answer and
22     direct you not to answer.
23   A. I received the file that contained
24 various paperwork. And that was the first I
25 got it.

R. LA TOUR, ESQ.

1         R. LA TOUR, ESQ.
2   Q. Who did you receive it from?
3   A. It was just assigned to me.
4   Q. Was it the supervisor who assigned
5 it to you?
6   A. Usually supervisors assign cases.
7   Q. Do you know who it was?
8   A. I don't know who assigned it to
9 me.
10   Q. Were there discussions with the
11 supervisor at that time that it was being
12 assigned to you because you had involvement
13 with the victim?
14   A. No.
15     MS. GRADY: Objection.
16   Q. So when you got the file, do you
17 remember what day that was?
18   A. No.
19   Q. Do you have any notes about that,
20 what day you received the file?
21   A. No.
22   Q. Did you review anything to prepare
23 for today's deposition?
24   A. Yes.
25   Q. What did you review?

R. LA TOUR, ESQ.

1         R. LA TOUR, ESQ.
2     MS. GRADY: Objection.
3   Q. You can answer. As a general rule
4 unless you get instructed not to answer, you
5 can answer.
6     MR. ZELMAN: I have had this issue
7     before. Judges allow it.
8   A. The Discovery that you received.
9   Q. Okay. And do you remember what
10 you got? What was in the file? What
11 documents were in the file?
12   A. I believe it was turned over to
13 you. Which would have been the District
14 Attorney's office data sheet, the Complaint
15 drafted by an Assistant District Attorney,
16 the Notice given at that arraignment,
17 various police reports.
18   Q. When you got the file, the
19 arraignment had already happened?
20   A. That's correct.
21   Q. Do you remember how long after the
22 arraignment you got the file, a day, a week,
23 a month, something else?
24   A. I don't recall the exact day.
25   Q. Okay. Do you remember

R. LA TOUR, ESQ.

1         R. LA TOUR, ESQ.
2 approximately how long it would have been?
3   A. It was less than a month.
4 Probably more than a day.
5   Q. Do you remember speaking to
6 anybody at the District Attorney's office
7 about the case? Did you have any
8 conversations with the ADA who handled this
9 case; if you recall?
10     MS. GRADY: Objection. Privilege.
11     Do not answer.
12     MR. ZELMAN: If she had
13     conversations.
14     MS. GRADY: Whether she had
15     conversations or not.
16   A. No.
17   Q. You did not have conversations?
18   A. I did not.
19   Q. Okay. So when you picked up the
20 file and read through it, what did you learn
21 about the case?
22     MS. BROWN: Objection. You can
23     answer.
24     MS. GRADY: Go ahead.
25   A. Just what was in the document. I

R. LA TOUR, ESQ.

read all of the documents.

Q. Okay. So just give us like a synopsis of what you learned about the case?

A. So I learned that Tricia Curulli's babysitter was home. Tricia Curulli was not home. The babysitter observed a truck pull up to the shed or garage located at Ms. Curulli's property or garage. Individuals got out of the truck, broke the lock on the shed, took various items out of the shed, pulled away.

I learned that Robert Tortora had been identified. There was a line up. Robert Tortora was arrested. He made a statement to the police. And that's the synopsis of the case I guess.

Q. Okay. Now, at any point, did you have pictures in the file?

A. Yes.

Q. What pictures did you have?

A. I believe there was some sort of photograph of Mr. Tortora with writing on it by the eyewitness. And there were pictures of a truck by a shed. That was the shed

R. LA TOUR, ESQ.

that was identified as the shed located on Ms. Curulli's property.

Q. This picture of Mr. Tortora, was this a picture taken at the scene of the incident or some other time?

A. I don't know when it was taken. It does not appear to be at the house.

Q. Okay. So it is a picture of him looking at the picture smiling, that kind of thing?

A. I believe so.

Q. Were you informed of where that picture came from or how that picture got into the file?

A. I don't believe so.

Q. Did you ever come to learn how it came to be in the file?

A. I don't believe so.

Q. Were there any other pictures of people in the file?

A. I don't believe so.

Q. The eyewitness testified that she provided the police officers with pictures of the people who were at the scene of the

R. LA TOUR, ESQ.

incident, did you ever view that?

A. I don't --

MS. BROWN: Objection.

A. I don't believe so.

Q. Did you ever learn if there were other pictures that there were not made available to you?

MS. BROWN: Objection.

A. No, I did not learn of any other pictures.

Q. Now, when you picked up the file, you said Mr. Tortora had given a statement; is that right?

A. Yes.

Q. What was that?

A. I can't recall the exact statement. I believe the sum and substance of the statement was that Mr. Curulli had asked him to pick up some property for him at the house. I believe part of the statement was also that he was not in Staten Island when the event occurred.

Q. Were you made aware of any alibi evidence when you got the file or

R. LA TOUR, ESQ.

thereafter?

MS. GRADY: From whom?

MR. ZELMAN: At any point from anybody.

MS. GRADY: Objection. Go ahead.

THE WITNESS: Can I answer now?

MS. GRADY: If you understand the question.

A. I was made aware that there was -- that Mr. Tortora was saying he was in Ocean City, Maryland at the time of the incident.

Q. Other than that, were you provided a video of him?

A. I was never provided a video.

Q. Do you remember the source of that information: Was it through his statement that he was claiming to be there?

MS. BROWN: Objection.

A. His statement was one source of information.

Q. And what other source of information was it that you recall about Ocean City, Maryland or about him being in Ocean City, Maryland?

1           R. LA TOUR, ESQ.
2       MS. BROWN:  Objection.
3       A.   So his defense attorney said
4   something about it.
5       Q.   And that was one of the
6   appearances that you attended?
7       A.   I never attended an appearance in
8   court.
9       Q.   How were you made aware of what
10  defense counsel said, from a report or
11  another ADA?
12      A.   I know at one point that I had a
13  conversation with a defense attorney.
14      Q.   Okay.  Was there any video in the
15  file of Ocean City, Maryland showing him
16  being in Ocean City, Maryland at the time of
17  the incident?
18      A.   No.
19      Q.   Were you ever provided with that?
20      A.   No.
21      Q.   There has been testimony in this
22  case that a retired detective spoke to
23  investigating officer, I think Mr. Danziger,
24  about being with Mr. Tortora in Ocean City,
25  Maryland at the time of the incident, were

1           R. LA TOUR, ESQ.
2   you ever made aware from any source about
3   Mr. Keen's statement with Mr. Danziger?
4       MS. BROWN:  Objection.
5       A.   I don't believe so.
6       Q.   Did you ever have a conversation
7   with Mr. Danziger?
8       A.   I don't believe so.
9       Q.   Did you ever speak to anybody, any
10  officer, employed officer about this case
11  during the prosecution of this case?
12      A.   I don't believe so.
13      Q.   Did anyone try to contact you?
14      MS. BROWN:  Objection.
15      A.   I would not know if somebody tried
16  to contact me.
17      Q.   To the best of your recollection,
18  how many appearances were there in this
19  case?
20      A.   I don't know.
21      Q.   Do you remember how many months it
22  lasted?
23      A.   I don't know.  I went on leave in
24  August of 2014.
25      Q.   So let us get a time frame here.

1           R. LA TOUR, ESQ.
2   When was this arrest?
3       A.   I believe it was May of 2014.
4       Q.   The arrest?
5       A.   I believe so.
6       Q.   So when did you handle this case?
7       A.   It would have been from May of
8   2014 until August of 2014.
9       Q.   I thought -- I  got it.  Was the
10  case dismissed from before you left?
11      A.   It was still open when I left.
12      Q.   So you handled this case from May
13  to August 2014?
14      A.   Yes.
15      Q.   At any point, did you make a
16  decision about what to do with the case?
17      A.   Yes.
18      Q.   What was that decision?
19      A.   At that point in time, I was not
20  going to indite the case.
21      Q.   And do you remember when that
22  decision was made?
23      A.   I'm sorry?
24      Q.   Do you remember when that decision
25  was made?

1           R. LA TOUR, ESQ.
2       A.   No.
3       Q.   Let me show you what has been
4   marked as Defendant's Exhibit 73 for
5   identification.
6       MS. BROWN:  Can we have this
7   marked by the court reporter as an
8   exhibit, Plaintiff's Exhibit 1.
9       (Whereupon, the aforementioned
10  City's Def-73/buck sheet, was marked as
11  Plaintiff's Exhibit 1, for
12  identification as of this date by the
13  reporter.)
14      MR. ZELMAN:  I'll take a quick
15  break.
16      (Whereupon, a short recess was
17  taken.)
18      MR. ZELMAN:  Back on the record.
19  I am showing the witness what has been
20  marked as Defendant's 73.
21      Q.   Do you recognize that document?
22      A.   I do.
23      Q.   Is your handwriting on there?
24      A.   I see my handwriting a little bit.
25      Q.   Show us where.

R. LA TOUR, ESQ.

A. So, my handwriting is that little "no grange reaction, no offer, 918, part one."

Q. Do you see where it says "Brady on inside note put on record?"

A. I see that.

Q. What does that refer to?

A. Based on my recollection of the court file, there was a note on the inside that listed brady material. "Brady" is exculpatory information that has to be provided to the Defendant.

Q. So what was it?

MS. GRADY: Objection.

MR. ZELMAN: She said it was put on the record.

A. I didn't say it was put on the record. I said the note was put on record.

Q. All right. So what was the brady material? If you recall.

MS. GRADY: Objection. If you know.

A. So I believe it had to do with -- not sure -- with the identification

R. LA TOUR, ESQ.

procedure.

Q. Does that mean the lineup?

MS. BROWN: Objection.

A. It would refer to the lineup.

Q. Do you know specifically what was said on the record regarding the lineup?

A. I don't.

Q. Do you know when that was put on the record?

A. I don't know if it was put on the record. I know the note says put it on the record.

Q. Did you speak to Ms. Curulli about this case?

A. I believe so.

Q. Was that at your office, or some other location, over the phone?

A. I believe over the phone while I was in my office.

Q. Do you remember if you spoke to her once or more than once?

A. I don't recall.

Q. She was not a witness to this incident, right?

R. LA TOUR, ESQ.

A. An eyewitness?

Q. Right.

A. No.

Q. What did she tell you?

A. I don't recall her exact words. The sum and substance would be that it was her house. That her babysitter was there, but she was not. And basically a recap of. The story that the babysitter had told the police according to what was in the police records.

Q. Okay. Did she ever say she thought it was Mr. Tortora who did this crime or not?

A. I don't remember.

MS. BROWN: Objection. Go ahead.

A. I don't recall.

Q. Did you ever speak to the eyewitness?

A. I believe so.

Q. Is that also over the phone?

A. I don't believe so.

Q. Did you ever speak to her in person?

R. LA TOUR, ESQ.

A. No.

Q. Was it one time or more than one time?

A. I don't recall.

Q. Did she call you or did you call her?

A. I would have called.

Q. Would you have called her when you received the file or contemporaneous with that?

A. Yes.

Q. What did she say to you?

A. Basically what would have been in the file. That she was at the house, Ms. Curulli was not. A truck pulled up, pictures were taken of the truck. I believe she took pictures of the truck.

People had gotten out, went into the shed, took property out of the shed, they drove off.

Q. Did she say she recognized anybody?

A. She did not know them.

Q. Did you ask her about whether she

R. LA TOUR, ESQ.

1        R. LA TOUR, ESQ.
2  was able to see them, like their faces?
3      A.  I don't recall.
4      Q.  Did she say that she saw their
5  faces?
6      A.  I don't recall.
7      Q.  Did she say how, did you ask her
8  how she was able to identify anybody?
9      A.  I don't recall if I asked her
10  that.
11      Q.  Do you remember if she said
12  anything about that?
13      A.  My recollection of the story was
14  that she said that she gave description to
15  Tricia.  And she was shown pictures I
16  believe from a wedding album of people that
17  Tricia thought it could have been.  And that
18  she picked somebody out from those pictures.
19  And subsequent to that, she picked
20  Mr. Tortora out of a lineup.
21      Q.  And to the best of your knowledge,
22  when Ms. Curulli showed pictures to her from
23  the wedding album, were the officers there
24  at that time?
25      A.  According to the story?  According

R. LA TOUR, ESQ.

1        R. LA TOUR, ESQ.
2  to the story, no.  This would have been
3  before the police report was even made.
4      Q.  When you say "the story," what do
5  you mean by that?
6      A.  The recounting of the incident.
7      Q.  By who?
8      A.  By I believe both Mr. Deluca and
9  Ms. Curulli.
10      Q.  With respect to the truck, were
11  you able to gain any plate information, et
12  cetera with the truck?
13      A.  Not that I recall.
14      Q.  Do you remember any investigation
15  that was done as to whose truck it was?
16      A.  I believe so.
17      Q.  What was the -- just if you can
18  recount that investigation.
19      A.  I don't recall.  It was not done
20  by me.
21      Q.  Do you remember the results of it?
22      A.  I don't recall.
23      Q.  Do you remember if besides
24  Ms. Deluca's alleged identification, do you
25  recall any other evidence against

R. LA TOUR, ESQ.

1        R. LA TOUR, ESQ.
2  Mr. Tortora in the case?
3      MS. BROWN:  Objection.  Go ahead.
4      A.  I thought his statement was
5  evidence against him.
6      Q.  Okay.  Anything else?
7      A.  I don't know what you mean.
8      Q.  Anything else that was inculpatory
9  other than her statement and his statement.
10      A.  I think that is a hard question to
11  answer if you are talking about physical
12  evidence.
13      Q.  Okay.
14      A.  No, there was not.
15      Q.  How about the neighbor's
16  statements?
17      A.  I don't recall neighbor's
18  statements.  I do recall a neighbor
19  confirmed with the police according to the
20  detective's notes that a neighbor also saw a
21  truck pull up I believe.
22      Q.  Okay.  But the neighbor did not
23  say who was in the truck or provided a
24  description?
25      A.  I don't believe so.

R. LA TOUR, ESQ.

1        R. LA TOUR, ESQ.
2      Q.  Was there surveillance of the
3  truck driving away, if you know?
4      A.  All I know about are the pictures.
5      Q.  Do you know if the property was
6  ever recovered?
7      A.  Not to my knowledge.
8      Q.  Do you know if the lock was broken
9  to get into the shed or something else?
10      A.  That is my recollection of the
11  account.  He said that the lock was broken.
12      Q.  Did they collect the broken lock?
13      A.  I don't recall.
14      Q.  Were you able to ascertain this
15  property in the shed was Ms. Curulli's?
16      MS. BROWN:  Objection.
17      A.  The information that I received
18  from Ms. Curulli herself is that it was
19  Mr. Curulli's property.
20      Q.  Okay.  Did you ever attempt to
21  contact Mr. Curulli?
22      A.  No.
23      Q.  Any reason?
24      A.  At that point in time, he was
25  still a Defendant represented by counsel in

7 (Pages 25 to 28)

1        R. LA TOUR, ESQ.
2    another case I believe.
3        Q.   All right.  As he became a victim
4    in this case if his property was stolen,
5    right?
6        A.   No.
7        MS. BROWN:  Objection.
8        Q.   You said it was Ms. Curulli it was
9    Mr. Curulli's property?
10       A.   That's correct.
11       Q.   So his property was stolen, right?
12       A.   No.
13       Q.   Why not?
14       A.   According to my previous
15   testimony, the statement by Mr. Tortora, was
16   that Mr. Curulli asked him to get his
17   property.
18       Q.   Right.  I thought you said
19   Ms. Curulli told you that the property
20   belonged to Mr. Curulli?
21       A.   That's correct.  And Mr. Tortora
22   said Mr. Curulli asked him to take his
23   property.
24       Q.   Okay.  What I am saying is, if the
25   property was stolen and it belonged to

1        R. LA TOUR, ESQ.
2    Mr. Curulli, he is a victim in that case?
3        A.   No.
4        Q.   Why not?
5        A.   Not if he is the one who asked his
6    friend Mr. Tortora to take his property for
7    him.
8        Q.   I see.  Did you ever get receipts
9    for the property?
10       A.   No.
11       Q.   What was stolen, if you recall?
12       A.   I don't recall everything.  I do
13   recall a boat motor.  I don't recall
14   anything else.  The boat motor sticks out to
15   me.
16       Q.   Were you ever made aware of a
17   controlled call to Mr. Curulli in the case?
18       A.   Not at the time of the incident.
19       Q.   At the present time during your
20   prosecution of the case?
21       A.   No.
22       Q.   I take it that you learned about
23   it long after?
24       A.   Yes.
25       Q.   Did you ever speak to the ADA who

1        R. LA TOUR, ESQ.
2    took the data sheet?
3        A.   No.
4        Q.   Did you ever speak to a Defendant,
5    Donnelly about the case?
6        A.   Detective?
7        Q.   Yes.
8        A.   No.
9        Q.   To the best of your knowledge,
10   were you made aware that Mr. Tortora claimed
11   to have been driving in a vehicle with a
12   retired judge around the time of this
13   incident?
14       A.   I don't recall.
15       Q.   So the only information that you
16   had about the alibi defense was from
17   Mr. Tortora himself; is that correct?
18       A.   No.
19       Q.   What other source of information
20   about the alibi did you have?
21       A.   At some point during the
22   prosecution of the case from his defense
23   attorney at the time, I received copies of
24   receipts from gas stations as well as a
25   printed out copy of hotel reservation

1        R. LA TOUR, ESQ.
2    confirmation.  I believe that is the extent
3    of the information that I got.
4        Q.   All right.  Did you discuss that
5    with defense counsel?
6        A.   I did.
7        Q.   Tell us the sum and substance of
8    that discussion.
9        A.   I did not find the receipts for
10   the gas stations very helpful, because there
11   was no name on any of the receipts.  They
12   were just receipts for gas stations.
13       And the printed out confirmation,
14   I did not find very helpful.  Because it was
15   a printed out booking confirmation.  It does
16   not mean that he actually went there.
17       I did not receive anything other
18   than that.  I believe a video was mentioned
19   at some point.  It was never provided to me.
20       Q.   Apparently according to the
21   original data sheet, there were two males
22   involved in the case.  Do you remember any
23   investigation done as to the other male?
24       MS. BROWN:  Objection.
25       A.   No.

R. LA TOUR, ESQ.

1          R. LA TOUR, ESQ.
2     Q. Do you remember any discussions
3  about who that might have been?
4     A. I don't remember any discussions.
5     Q. It also says that there was a
6  black power washer in the bed of the pickup
7  truck; does that refresh your recollection
8  as to what was allegedly stolen?
9     A. I don't know. All I recall was
10 the boat motor. It stuck out to me. I know
11 the other items were various sorts of, you
12 know, tools or lawn stuff that would have
13 been in a shed. But I don't recall.
14    Q. Did Ms. Curulli say those things
15 belonged to her ex?
16       MS. BROWN: Objection.
17    A. She told me everything that was
18 taken belonged to her ex.
19    Q. Did you ever meet Mr. Tortora?
20    A. No.
21    Q. Did you ever see him in court?
22    A. No.
23    Q. Were you ever made aware of any
24 health issues that he had?
25       MS. BROWN: Objection.

1          R. LA TOUR, ESQ.
2     A. No.
3     Q. Did you know the ultimate outcome
4  of this case?
5     A. As far as I know, it was
6  eventually dismissed.
7        MR. ZELMAN: Can we have this
8     marked for identification as
9     Plaintiff's Exhibit 2, for
10    identification?
11       (Whereupon, the aforementioned
12    document Bates Def-71 was marked as
13    Plaintiff's Exhibit 2, for
14    identification as of this date by the
15    reporter.)
16       MS. BROWN: What Bates number is
17    on that?
18       MS. GRADY: Defendant 71.
19    Q. Directing your attention to Bates
20 71; is that part of the court file for this
21 case?
22    A. Part of the court file?
23    Q. Yes.
24    A. No.
25    Q. Is it part of the DA file?

1          R. LA TOUR, ESQ.
2     A. Yes.
3     Q. Do you see your handwriting there
4  anywhere?
5     A. No.
6     Q. On the bottom it says "dismissed."
7  Can you read it?
8     A. "Cannot prove BRD."
9     Q. And B-R-D stands for?
10    A. Beyond Reasonable Doubt.
11    Q. That decision was made after you
12 left the DA's office, after you were on
13 leave; is that accurate?
14    A. When was the decision made or when
15 was this written?
16    Q. Either, if you know.
17    A. The dismissal happened after I
18 left.
19    Q. Okay. It was the decision of the
20 DA's office to dismiss the case, correct?
21    A. What I know is that I was not
22 going to indite the case.
23    Q. But by not inditing the case that
24 is not dismissing the case, right?
25    A. Not inditing the case is not the

1          R. LA TOUR, ESQ.
2  same as dismissing the case; that's correct.
3     Q. Sure. What is the difference?
4     A. Well, when you indite the case,
5  you present it to the Grand Jury. When you
6  dismiss the case, you make a motion to the
7  judge to have the charges dismissed.
8     Q. Okay. The decision not to indite,
9  that's made within eight days of the arrest;
10 is that right?
11    A. No.
12    Q. Okay. How long after the arrest
13 does the decision not to indite need to be
14 made?
15    A. You have six months to prosecute a
16 felony charge.
17    Q. Do you remember when the decision
18 was made not to indite in terms of vis-a-vis
19 the arrest?
20    A. I decided that I would not indite
21 the case. I don't recall exactly when. It
22 was after I was assigned the case, before I
23 left.
24    Q. Would you say it was towards the
25 beginning portion of when you got the case,

9 (Pages 33 to 36)

R. LA TOUR, ESQ.

1    R. LA TOUR, ESQ.
2  towards the end, somewhere in the middle, or
3  something else?
4       MS. BROWN:  Objection.
5    A.  I would say it was made within the
6  first month.
7    Q.  Okay.  That document in front of
8  you indicates that at some point the
9  District Attorney's office decided to
10  dismiss the case because they could not
11  prove it beyond a reasonable doubt, correct?
12   A.  That is what it indicates.
13       MS. BROWN:  Objection.
14       THE WITNESS:  Sorry.
15   Q.  Did you ever have discussions with
16  anybody about that decision?
17       MS. GRADY:  Objection.  That calls
18  for privilege information.
19       MR. ZELMAN:  If she had
20  discussions.
21       MS. GRADY:  You are asking a very
22  content-specific question.  Whether she
23  had a conversation with people about
24  the case being able to prove beyond a
25  reasonable doubt.  That is privileged.

1    R. LA TOUR, ESQ.
2       MR. ZELMAN:  I respectfully
3  disagree.
4    Q.  Were you ever made aware that
5  there was a motion to dismiss made by the
6  District Attorney's office?
7    A.  At a later time I found out that
8  the case was dismissed.
9    Q.  Okay.  Did you ever find out
10  before it was dismissed that someone planned
11  to have it dismissed?
12       MS. GRADY:  Objection.
13  Privileged.
14       MR. ZELMAN:  Privileged?  I did
15  not ask about the conversation.  I
16  asked if she became aware that someone
17  planned to make that motion.
18       MS. GRADY:  How would she become
19  aware except through privileged
20  conversation?  Okay, if she became
21  aware of it without it being a
22  privilege conversation.
23   A.  I don't think that I ever became
24  aware of a specific plan to dismiss.  The
25  natural outcome of deciding not to indite a

1    R. LA TOUR, ESQ.
2  case, that's a felony.  It would be an
3  eventual dismissal based on you running out
4  of your 30-30 time.
5    Q.  Got it.  This case was not
6  dismissed on 30-30; this case was dismissed
7  by a motion of DA, correct?
8       MS. BROWN:  Objection.  You know,
9  if you know.
10   A.  I don't know what happened in
11  court.
12   Q.  Sometimes the DA's office will
13  dismiss a case because if they don't, it
14  will be dismissed 30-30; is that correct?
15       MS. GRADY:  Objection.
16  Privileged.
17       MR. ZELMAN:  I am not asking about
18  this case.  In general.
19       MS. GRADY:  Exactly.
20       MR. ZELMAN:  Okay.
21   Q.  Do you know if the District
22  Attorney's office ever investigated that
23  alibi defense other than just receiving the
24  information from defense counsel?
25       MS. BROWN:  Objection.

1    R. LA TOUR, ESQ.
2    A.  I can only speak as to what I did.
3    Q.  You testified earlier you did not,
4  right?
5    A.  I did not what?
6    Q.  Investigate the alibi?
7    A.  I did not say that.
8    Q.  Did you investigate the alibi?
9    A.  The documents that I testified
10  earlier that I received, I received because
11  I asked for them.
12   Q.  Okay.
13   A.  I also know that I compared some
14  of the times and the Defendant's statements
15  against Google Maps between the time of the
16  address and the address of the hotel that he
17  gave me the confirmation for.  And based on
18  his statement, I believe that he arrived in
19  Ocean City around 12:30, 12:50.
20       I believed also according to the
21  information that is provided by Google Maps
22  that if there is no traffic that he could
23  have done that and been in Ocean City,
24  Maryland at the time that he gave.
25       And because I received no

R. LA TOUR, ESQ.

1          R. LA TOUR, ESQ.
2   dispositive alibi material to discount that,
3   then it was not helpful to me.
4       Q.   I'm sorry if I misheard you.  But
5   did you say you became aware that there was
6   a video at some point?
7       A.   That's correct.
8       Q.   And did you ask for that video?
9       A.   I did.
10      Q.   From defense counsel?
11      A.   That's correct.
12      Q.   But never got it?
13      A.   That's correct.
14      Q.   At the time of his arrest and at
15  the time of his arraignment, you had not
16  been assigned to this case, correct?
17      A.   That's correct.
18      Q.   During your representation of The
19  People, did you ever become aware of how
20  long he was detained before arraignment?
21      A.   I would have been able to look at
22  the police report to ascertain that.
23      Q.   Did it ever come up as an issue?
24      A.   No.
25          MS. BROWN:  Objection.

1          R. LA TOUR, ESQ.
2       THE WITNESS:  Sorry.
3       MR. ZELMAN:  Can we mark this as
4   Plaintiff's Exhibit 3, for
5   identification?
6          (Whereupon, the aforementioned
7       photograph was marked as Plaintiff's
8       Exhibit 3, for identification as of
9       this date by the reporter.)
10      Q.   I will show you what has been
11  marked as Plaintiff's Exhibit 3, Def's-35.
12  Do you recall if that is the photograph that
13  you testified to earlier that you received?
14      A.   Yes.
15      Q.   So that looks like a photograph of
16  somebody at a party or something to that
17  effect?
18          MS. BROWN:  Objection.
19      A.   I don't know.
20          MS. BROWN:  I don't have a copy.
21  So would I be able to see that please?
22  Thank you.
23          MR. ZELMAN:  Let us mark this as
24  well, Defendant's 52, Plaintiff's
25  Exhibit 4.

1          R. LA TOUR, ESQ.
2          (Whereupon, the aforementioned
3       Defendant-52, was marked as Plaintiff's
4       Exhibit 4, for identification as of
5       this date by the Reporter.)
6       Q.   Directing your attention to
7   Plaintiff's Exhibit 4, Defendant-52; do you
8   recall if that would have been a document
9   that you viewed when you received the file?
10      A.   I'm taking a moment to look at it.
11      Q.   Sure.
12      A.   Yes.
13      Q.   All right.  Just directing your
14  attention to that little squib on the bottom
15  of the page.  Can you read the last two
16  sentences?
17      A.   Where it says "detailed summary of
18  investigation?"
19      Q.   Yes.
20      A.   Starting from "wooden door" or
21  starting with "conferred?"
22      Q.   Wooden door.
23      A.   "Wooden door from the shed was
24  non-conducive for fingerprint.  And padlock
25  from the door was taken by the perpetrators.

1          R. LA TOUR, ESQ.
2   Conferred on the scene with "Detective
3   Denzinger, D-E-N-Z-I-N-G-E-R, tax number
4   917500.  Babysitter who was in the house at
5   time of the burglary did take photographs of
6   the perpetrators."
7       Q.   Did you ever ask for those
8   photographs?
9          MS. BROWN:  Objection.
10      A.   I asked for photographs taken.
11      Q.   Did you ever have a discussion
12  with any of the officers, or anyone, or
13  Ms. Deluca about photographs of the
14  perpetrators?
15      A.   I don't recall if I specifically
16  said pictures of the perpetrators.
17      Q.   Do you remember being informed
18  they were available or not available?
19      A.   I asked for photographs.  The
20  photographs that I received were the
21  photographs of the truck.  I don't recall if
22  individuals were in those photographs.
23      Q.   Okay.  And do you ever remember
24  specific conversation that -- is this a DD5?
25      A.   It is a DD5.

R. LA TOUR, ESQ.

1
2    Q.   Did you ever have a conversation
3    with anyone if you recall about the fact
4    that the DD5 says that the witness took
5    photographs of the perpetrators but you did
6    not have photographs of the perpetrators?
7        MS. BROWN:  Objection.
8    A.   I don't recall specific
9    conversations about photographs of the
10   perpetrators.
11   Q.   Okay.
12       MR. ZELMAN:  I'll take a quick
13   break.
14       (Whereupon, a short recess was
15   taken.)
16       MR. ZELMAN:  Back on the record.
17   Q.   A couple of follow-up questions.
18   You mentioned that you knew Ms. Curulli
19   before this incident, you had prosecuted a
20   case against Mr. Curulli, correct?
21   A.   Yes.
22   Q.   Have you ever spoken to
23   Mr. Curulli?
24   A.   No.
25   Q.   In that prior case, how many

R. LA TOUR, ESQ.

1
2    contacts did you have with Ms. Curulli; did
3    you see her, meet her in person?
4        MS. BROWN:  Objection.
5    A.   Yes.
6    Q.   Did you speak to her on the phone?
7    A.   Yes.
8    Q.   You became aware that she was a
9    retired officer from the Richmond County for
10   the NYPD?
11       MS. BROWN:  Objection.
12   A.   To my knowledge, yes.
13   Q.   The fact that she was a retired --
14   was it detective or officer; do you know?
15   A.   I don't know.
16   Q.   The fact that she was retired with
17   the NYPD, did you handle this witness in any
18   other way than you would have any other
19   witness?
20       MS. BROWN:  Objection.
21   A.   No.
22   Q.   Did you ever meet Detective
23   Danziger in your career?
24   A.   I believe so.
25   Q.   Was it before or after this

R. LA TOUR, ESQ.

1
2    prosecution of Mr. Tortora?
3    A.   I don't recall.
4    Q.   You met him in person?
5    A.   I believe -- I believe so.
6    Q.   Do you remember what the context
7    was?
8    A.   No.
9    Q.   What about Donnelly, Defendant
10   Donnelly; did you ever meet him?
11   A.   Yes.
12   Q.   Do you remember if it was before
13   or after this prosecution of Mr. Tortora?
14   A.   I believe both.
15   Q.   What context would you meet him?
16   A.   Various arrests that he has made.
17   Q.   Would you typically talk to the
18   officers when they made an arrest and ended
19   up prosecuting that arrest?
20       MS. BROWN:  Objection.
21   A.   I don't know about typically,
22   because each case is a such a case by case
23   basis.  Sometimes I do, sometimes I don't.
24   Q.   And in this case, you testified
25   that you did not speak to Danziger or

R. LA TOUR, ESQ.

1
2    Donnelly at all?
3    A.   I don't believe I did.
4    Q.   Is there any specific reason that
5    you recall that you didn't.
6        MS. GRADY:  If you can answer.
7    Objection to the extent that it calls
8    for privilege information.
9        MR. ZELMAN:  Okay.
10   A.   At that point in time, I believe I
11   had gained what I wanted to know about the
12   case from my conversation and my review from
13   the paperwork.
14   Q.   You did not feel the need to speak
15   to them; is that correct?
16       MS. GRADY:  Objection.  It calls
17   for privilege information.
18   Q.   My previous question was, did you
19   reach out to the officers at all?
20   A.   I don't believe so.
21   Q.   Did they reach out to you?
22       MS. BROWN:  Objection.
23   A.   Not to my knowledge.
24   Q.   Okay.  Mr. Tortora, did you ever
25   meet him before this incident?

R. LA TOUR, ESQ.

1  A.  No.
2  Q.  You never met him at all actually?
3  A.  No.
4  Q.  Was there anything that you
5  learned during the course of this
6  prosecution that caused you to make the
7  decision not to indite or was this just
8  information that you had at the outset?
9  MS. GRADY:  Objection.  Calls for
10 privilege information.
11 MR. ZELMAN:  Are you directing her
12 not to answer?
13 MS. GRADY:  Yes.
14 Q.  Did you receive any information
15 about the case other than your conversation
16 with Curulli, your conversation with Deluca,
17 and your review of the file that you
18 received; did you ever receive any
19 documentation about Ocean City, Maryland?
20 Other than the file that you
21 originally received and the paperwork about
22 the Ocean City, Maryland receipts that you
23 received and mentioned, did you ever receive
24 any other documentation or photographs

R. LA TOUR, ESQ.

1  during your representation of The People in
2  the case?
3  MS. BROWN:  Objection.
4  A.  No.
5  Q.  Other than speaking to Curulli and
6  Deluca, do you recall speaking to anybody
7  else, any other witnesses, or the officers
8  regarding this prosecution?
9  MS. BROWN:  Objection.
10 A.  No.
11 Q.  Okay.  And you testified
12 earlier that your conversations with Curulli
13 and Deluca was over the phone, but do you
14 remember how many times you spoke to them?
15 MS. BROWN:  Objection.
16 A.  I don't recall.
17 Q.  You don't remember getting any
18 other information like let's say with
19 respect to the court appearances informed of
20 what happened at the court appearances?
21 A.  I'm informed of what happens in
22 court appearances in terms of being
23 adjourned.
24 Q.  Without telling me any content, do

R. LA TOUR, ESQ.

1  you remember any substantive material that
2  you learned  at the court conferences other
3  than the receipts about Ocean City,
4  Maryland?
5  MS. BROWN:  Objection.
6  THE WITNESS:  I am sorry.
7  A.  I don't believe I received a
8  receipt as a result of the court conference.
9  I believe I received those documents based
10 on my conversations with counsel that
11 occurred off calendar.
12 I don't believe that I received
13 any other substantive information from the
14 court appearances.  May I look at the
15 exhibits again?
16 Q.  (Handing).
17 A.  And looking at Plaintiff's Exhibit
18 1, in the deposition.  It looks like I was
19 only there prosecuting the case for the one
20 adjournment.
21 Q.  Okay.  It was before that
22 adjournment that you decided not to indite
23 the case, correct?
24 A.  It would have been after the

R. LA TOUR, ESQ.

1  arraignment on May 4th.  And before the
2  court date on June twenty -- I'm sorry --
3  before the court date on September 18th.
4  I don't know exactly when between
5  May 4th and August of 2014, I made that
6  decision.
7  Q.  Okay.  With respect to the
8  conversation with defense counsel other than
9  what you have already testified to, do you
10 recall any other information that you
11 learned about the case?
12 MS. BROWN:  Objection.  By
13 "defense counsel," do you mean criminal
14 defense counsel or defense counsel in
15 this case?
16 MR. ZELMAN:  No, criminal defense
17 counsel.
18 A.  No.  I believe any substantive
19 conversation we had about the case was
20 solely about the alibi.  And the extent of
21 the alibi evidence that I received and that
22 I had knowledge of is what I testified to
23 earlier.
24 Q.  How many conversations did you

13 (Pages 49 to 52)

R. LA TOUR, ESQ.

1 have with defense counsel about the alibi?
2 A. I don't recall how many. I know
3 that there were a few.
4 MR. ZELMAN: That's okay. I have
5 nothing further.
6 MS. BROWN: I just have a few
7 follow-up questions for you.
8 EXAMINATION BY
9 MS. BROWN:
10 Q. Do you recall testifying about
11 brady material in connection with the
12 criminal prosecution against Robert Tortora?
13 A. Yes.
14 Q. And do you recall testifying about
15 somehow that brady material had to do with
16 the lineup in this case?
17 A. I believe that it had to do with
18 the identification.
19 Q. With the identification? What do
20 you mean that the brady material had to do
21 with identification?
22 A. If I remember correctly, I believe
23 it had to do with the disclosure that the
24 eyewitness, Ms. Deluca had been shown

R. LA TOUR, ESQ.

1 photographs previous to the lineup.
2 Q. And to the best of your knowledge,
3 who showed Ms. Deluca those photographs?
4 A. Ms. Curulli.
5 Q. And did she show those photographs
6 in the presence of any officers; if you
7 know?
8 A. To my knowledge, no.
9 MS. BROWN: No further questions.
10 MR. ZELMAN: To clarify.
11 CONTINUED EXAMINATION BY
12 MR. ZELMAN:
13 Q. Earlier you testified that you did
14 not believe the officers were there when the
15 photograph was shown to Ms. Deluca, correct?
16 A. I need you to specify what
17 photograph you are talking about. We have
18 spoken about a few photographs in the case.
19 Q. Just to clarify.
20 A. Yes.
21 Q. Earlier in the deposition, we were
22 having discussions about the fact that
23 Ms. Curulli showed the photographs to
24 Ms. Deluca before officers arrived.

R. LA TOUR, ESQ.

1 A. Yes.
2 Q. It is still your understanding
3 that that is what happened; is that right?
4 MS. BROWN: Objection.
5 THE WITNESS: Sorry.
6 A. My understanding is prior to
7 Ms. Curulli even calling the police, she
8 showed these photographs.
9 Q. And then the police were called
10 apparently after Ms. Deluca said to
11 Ms. Curulli that she thinks she can identify
12 somebody?
13 MS. BROWN: Objection.
14 A. That is my understanding.
15 Q. Now, did you ever learn that the
16 officers did an actual photographic lineup?
17 MS. BROWN: Objection.
18 A. I don't know what you mean by
19 photographic lineup.
20 Q. Meaning officers are able to do a
21 photo-array at the scene of a crime?
22 A. So a photo-array is different than
23 a lineup?
24 Q. Sure. A lineup is in-person.

R. LA TOUR, ESQ.

1 A. Yes.
2 Q. A photo-array is a photo-array?
3 A. Yes. Usually comprised of six
4 people, yes.
5 Q. So as far as you know, you would
6 not know the parameters of these pictures
7 that were shown to Ms. Deluca, if it was one
8 by one or something else, correct?
9 MS. BROWN: Objection. What
10 pictures are you talking about?
11 MR. ZELMAN: Curulli showed
12 pictures to Deluca before the officers
13 came.
14 A. My understanding is that she
15 showed her pictures from a wedding album.
16 Q. Okay.
17 A. And after Ms. Deluca gave her a
18 description of who she saw.
19 Q. Okay.
20 A. So my understanding is that
21 Ms. Deluca first described the individuals
22 to Ms. Curulli. And Ms. Curulli then took
23 out her wedding album, showed her
24 individuals she thought fit the description.

14 (Pages 53 to 56)

R. LA TOUR, ESQ.

And Ms. Deluca identified Mr. Tortora.  And
after that she called the police.  That is
my understanding based on my conversations.
        Q.   Did you ever get a copy of these
wedding photographs?
        A.   No.
        Q.   Did you ever ask for them?
        A.   No.
        Q.   There were no officers present
when Ms. Curulli was asking Ms. Deluca these
questions?
        A.   Not to my understanding.  That
this happened before police were even
notified about the incident.
        Q.   When the police were notified, do
you know if Ms. Curulli called in and said
"we have identified somebody" or something
else?
        A.   I don't recall.
        MS. BROWN:  Objection.
        A.   I don't recall.
        Q.   Do you know if the officers
brought a photo-array to the scene to have
Ms. Deluca view?

R. LA TOUR, ESQ.

        A.   I don't know if that happened.
        Q.   That would be brady material, why?
        MS. BROWN:  Objection.  What would
        be brady material?  Why what?
        Q.   Your testimony now is that it was
the photo-array that was done for lack of a
better phrase that was done by Ms. Curulli
that was the substance of the brady,
correct?
        A.   No.
        MS. BROWN:  Objection to the fact
        that you are characterizing that as a
        photo-array.  But go ahead.
        THE WITNESS:  That is what I was
        going to say.
        A.   I am going to say that a
photo-array refers to an actual official
police procedure where they normally --
right -- they go through a certain procedure
to generate photographs of an individual
that looks similar to the target individual.
They place them randomly, right, out of six,
and they ask somebody if that person is
present in the photo-array.

R. LA TOUR, ESQ.

        That is not what Ms. Curulli did
to my understanding.  My understanding is,
Ms. Curulli opened a photograph, a photo
album, showed her some people in the photo
album.  And asked if Ms. Deluca recognized
anybody.  Or -- I mean, I don't know exactly
how she showed her the photo album, but I
would not characterize that as a
photo-array.
        Q.   Why was that brady?
        A.   I am not the one who wrote down
that that was the brady that should be
revealed to defense counsel.
        Q.   So as you sit here today, are you
confident that, what we are discussing now,
that Ms. Curulli showed photograph to
Ms. Deluca before officers came is the brady
material that is referenced in the file or
you are not sure?
        MS. GRADY:  Objection.
        MS. BROWN:  Off the record.
        (Whereupon, an off-the-record
        discussion was held.)
        MR. ZELMAN:  Back on the record.

R. LA TOUR, ESQ.

        MS. GRADY:  Objection.
        Privileged.
        MR. ZELMAN:  Can you read back the
        question.
        (Whereupon, the referred-to
        question and was read back by the
        reporter.)
        MS. GRADY:  That is privileged
        information.
        Q.   You indicated that there is brady
material that was put on the record,
correct?
        A.   Yes.
        MS. BROWN:  Objection.
        Q.   What Defense Counsel asked you
about a minute ago -- you said that when you
testified earlier, you said that you thought
brady material had to do with the lineup,
correct?
        A.   That's correct.
        Q.   When Defense Counsel asked you
about it, you said you think the brady
material had to do with the photographs
being shown by Ms. Curulli?

R. LA TOUR, ESQ.

1
2      MS. BROWN:  Objection.
3      Q.  That's correct.  I don't know if
4  she asked me about brady material.  I
5  believe what Ms. Brown, if I am remembering
6  correctly just asked me about the pictures.
7  I don't know that she asked me about
8  anything in relation to whether or not that
9  was brady material.
10     Q.  All right.  As you sit here today,
11  with respect to the brady material as noted
12  in the file and it says it was put on the
13  record?
14     A.  Yes.
15     Q.  Do you know what that is referring
16  to?
17     A.  Well, I testified before that I
18  believe it had to do with the identification
19  procedure.
20     Q.  Do you specifically know if it had
21  to go with the lineup or the photographs
22  shown to Ms. Deluca?
23         MS. GRADY:  Do you know what is
24     the question?
25     A.  I believe that it had to do with

R. LA TOUR, ESQ.

1
2  the fact that she was -- that Ms. Deluca was
3  shown photographs of individuals by
4  Ms. Curulli before she did the lineup
5  identification procedure.
6      Q.  Okay.  And you indicated
7  earlier it was not your decision to make
8  that brady?
9      A.  That's correct.
10         MR. ZELMAN:  Okay, understood.  I
11     have nothing further.
12  CONTINUED EXAMINATION BY
13  MS. BROWN:
14     Q.  What is your understanding of what
15  brady material is?
16     A.  My understanding of brady material
17  is that it is exculpatory information.  That
18  is my strict sense of brady material.  Now,
19  that if you are asking for my understanding
20  of brady, sometimes I am broader in terms of
21  what I turn over.  Even if it is not
22  technically brady material I might turn it
23  over anyway, because I believe it is best
24  practice to do so.  Even though technically
25  it may be or would not be.

R. LA TOUR, ESQ.

1
2      MS. BROWN:  No further questions.
3      MR. ZELMAN:  Nothing further.
4  Thank you.
5      MS. GRADY:  Thank you.
6      (Whereupon, at 12:18 P.M., the
7  Examination of this witness was
8  concluded.)
9
10         ○    ○    ○    ○

R. LA TOUR, ESQ.

1
2  D E C L A R A T I O N
3
4      I hereby certify that having been first
5  duly sworn to testify to the truth, I gave
6  the above testimony.
7
8      I FURTHER CERTIFY that the foregoing
9  transcript is a true and correct transcript
10  of the testimony given by me at the time and
11  place specified hereinbefore.
12
13
14
         _____
15         RHIANNON LA TOUR, ESQ.
16
17
18  Subscribed and sworn to before me
19  this _____ day of _____ 20___.
20
21
         _____
22         NOTARY PUBLIC
23
24
25

```
 1           R. LA TOUR, ESQ.
 2           E X H I B I T S
 3
 4    PLAINTIFF'S EXHIBITS:
 5
 6    EXHIBIT    EXHIBIT
 7    NUMBER     DESCRIPTION          PAGE
 8    1       City's Def-73/Bucksheet    20
 9    2       City's Def-71         34
10    3       City's Def-35/Photograph   42
11    4       City's Def-52         43
12
13       (Exhibits retained by Counsel.)
14
15           I N D E X
16
17    EXAMINATION BY              PAGE
18    MR. ZELMAN                4, 54
19    MS. BROWN                 53, 62
20
21
22    INFORMATION AND/OR DOCUMENTS REQUESTED
23    INFORMATION AND/OR DOCUMENTS       PAGE
24    (None)
25
```

```
 1           R. LA TOUR, ESQ.
 2           C E R T I F I C A T E
 3
 4    STATE OF NEW YORK )
                    : SS.:
 5    COUNTY OF KINGS   )
 6
 7       I, GERMILA DONALD, a Notary Public for
 8    and within the State of New York, do hereby
 9    certify:
10       That the witness whose examination is
11    hereinbefore set forth was duly sworn and
12    that such examination is a true record of
13    the testimony given by that witness.
14       I further certify that I am not related
15    to any of the parties to this action by
16    blood or by marriage and that I am in no way
17    interested in the outcome of this matter.
18       IN WITNESS WHEREOF, I have hereunto set
19    my hand this 30th day of November 2017.
20
21
22       _____
               GERMILA DONALD
23
24
25
```

**A**

**able (8)**
25:2,8 26:11 28:14
37:24 41:21 42:21
55:21
**account (1)**
28:11
**accurate (1)**
35:13
**action (1)**
66:15
**actual (2)**
55:17 58:18
**ADA (4)**
4:23 12:8 17:11
30:25
**address (2)**
40:16,16
**adjourned (1)**
50:24
**adjournment (2)**
51:21,23
**administer (1)**
3:10
**aforementioned (4)**
20:9 34:11 42:6 43:2
**ago (1)**
60:17
**AGREED (2)**
3:4,19
**ahead (6)**
6:23 12:24 16:6
23:17 27:3 58:14
**album (7)**
25:16,23 56:16,24
59:5,6,8
**alibi (10)**
15:24 31:16,20 39:23
40:6,8 41:2 52:21
52:22 53:2
**alleged (1)**
26:24
**allegedly (1)**
33:8
**allow (1)**

11:7
**AND/OR (2)**
65:22,23
**ANNE (1)**
2:21
**anne.grady@rcda....**
2:21
**answer (13)**
8:14 9:20,21,22 11:3
11:4,5 12:11,23
16:7 27:11 48:6
49:13
**anybody (8)**
12:6 16:5 18:9 24:23
25:8 37:16 50:7
59:7
**anyway (1)**
62:23
**apparently (2)**
32:20 55:11
**APPEALS (1)**
2:18
**appear (1)**
14:8
**appearance (1)**
17:7
**appearances (6)**
17:6 18:18 50:20,21
50:23 51:15
**approximately (1)**
12:2
**April (1)**
5:19
**arraignment (6)**
11:16,19,22 41:15,20
52:2
**arrest (8)**
19:2,4 36:9,12,19
41:14 47:18,19
**arrested (1)**
13:15
**arrests (1)**
47:16
**arrived (2)**
40:18 54:25
**ascertain (2)**

28:14 41:22
**asked (15)**
15:20 25:9 29:16,22
30:5 38:16 40:11
44:10,19 59:6
60:16,22 61:4,6,7
**asking (4)**
37:21 39:17 57:11
62:19
**assault (3)**
6:19 8:4,18
**assign (3)**
7:16,19 10:6
**assigned (15)**
4:23 5:12,14 6:9,21
6:24 7:5,14 8:24
10:3,4,8,12 36:22
41:16
**assistant (6)**
2:18 5:20 6:2,7,13
11:15
**attempt (1)**
28:20
**attended (2)**
17:6,7
**attention (3)**
34:19 43:6,14
**attorney (8)**
2:17,18 4:12,20
11:15 17:3,13
31:23
**Attorneys (3)**
2:4,10,19
**Attorney's (6)**
7:19 11:14 12:6 37:9
38:6 39:22
**August (5)**
9:11 18:24 19:8,13
52:6
**authorized (1)**
3:10
**available (3)**
15:8 44:18,18
**aware (15)**
15:24 16:10 17:9
18:2 30:16 31:10

33:23 38:4,16,19,21
38:24 41:5,19 46:8
**A.M (1)**
1:13

**B**

**B (1)**
65:2
**babysitter (5)**
13:6,7 23:8,10 44:4
**back (7)**
4:24 8:11 20:18
45:16 59:25 60:4,7
**based (5)**
21:9 39:3 40:17
51:10 57:4
**basically (2)**
23:9 24:14
**basis (1)**
47:23
**Bates (3)**
34:12,16,19
**bed (1)**
33:6
**beginning (1)**
36:25
**believe (50)**
4:25 5:25 7:9 11:12
13:22 14:12,16,19
14:22 15:5,18,21
18:5,8,12 19:3,5
21:24 22:16,19
23:21,23 24:17
25:16 26:8,16
27:21,25 29:2 32:2
32:18 40:18 46:24
47:5,5,14 48:3,10
48:20 51:8,10,13
52:19 53:18,23
54:15 61:5,18,25
62:23
**believed (1)**
40:20
**belonged (4)**
29:20,25 33:15,18
**best (5)**

18:17 25:21 31:9
54:3 62:23
**better (1)**
58:8
**beyond (3)**
35:10 37:11,24
**bit (1)**
20:24
**black (1)**
33:6
**blood (1)**
66:16
**boat (3)**
30:13,14 33:10
**booking (1)**
32:15
**bottom (2)**
35:6 43:14
**brady (25)**
21:5,11,11,20 53:12
53:16,21 58:3,5,9
59:11,13,18 60:11
60:19,23 61:4,9,11
62:8,15,16,18,20,22
**BRD (1)**
35:8
**break (2)**
20:15 45:13
**broader (1)**
62:20
**broke (1)**
13:10
**broken (3)**
28:8,11,12
**Brooklyn (1)**
1:22
**brought (1)**
57:24
**Brown (59)**
2:14 6:23 7:23 8:8,15
9:18 12:22 15:4,9
16:19 17:2 18:4,14
20:6 22:4 23:17
27:3 28:16 29:7
32:24 33:16,25
34:16 37:4,13 39:8

39:25 41:25 42:18
42:20 44:9 45:7
46:4,11,20 47:20
48:22 50:4,10,16
51:6 52:13 53:7,10
54:10 55:5,14,18
56:10 57:21 58:4
58:12 59:22 60:15
61:2,5 62:13 63:2
65:19
**Bureau (3)**
2:18 5:21 6:14
**burglary (1)**
44:5
**business (1)**
4:11
**B-R-D (1)**
35:9

**C**

**C (4)**
2:2 64:2 66:2,2
**calendar (2)**
5:16 51:12
**call (3)**
24:6,6 30:17
**called (7)**
4:2,24 24:8,9 55:10
57:3,17
**calling (1)**
55:8
**calls (4)**
37:17 48:7,16 49:10
**career (1)**
46:23
**CARTER (1)**
2:9
**case (84)**
1:5 4:21,24 6:13,15
6:21,24 7:5,13,20
7:22 8:2,4,4,16,18
8:20,24,25 9:4,7,14
12:7,9,21 13:4,17
17:22 18:10,11,19
19:6,10,12,16,20
22:15 27:2 29:2,4

30:2,17,20 31:5,22
32:22 34:4,21
35:20,22,23,24,25
36:2,4,6,21,22,25
37:10,24 38:8 39:2
39:5,6,13,18 41:16
45:20,25 47:22,22
47:22,24 48:12
49:16 50:3 51:20
51:24 52:12,16,20
53:17 54:19
**cases (6)**
6:8,8,10,18,19 10:6
**category (2)**
6:16,17
**caused (1)**
49:7
**certain (1)**
58:20
**certification (1)**
3:7
**certify (4)**
64:4,8 66:9,14
**cetera (1)**
26:12
**characterize (1)**
59:9
**characterizing (1)**
58:13
**charge (1)**
36:16
**charges (1)**
36:7
**CHEBROWN@L...**
2:15
**CHERIE (1)**
2:14
**CHIEF (1)**
2:18
**children (1)**
6:19
**Church (1)**
2:13
**City (15)**
1:7,16 2:10,11 16:12
16:24,25 17:15,16

17:24 40:19,23
49:20,23 51:4
**City's (5)**
20:10 65:8,9,10,11
**Civil (1)**
1:19
**claimed (1)**
31:10
**claiming (1)**
16:18
**clarification (1)**
9:19
**clarify (2)**
54:11,20
**client (1)**
7:21
**collect (1)**
28:12
**come (2)**
14:17 41:23
**comes (1)**
7:13
**compared (1)**
40:13
**Complaint (1)**
11:14
**comprised (1)**
56:4
**concluded (1)**
63:8
**conference (1)**
51:9
**conferences (1)**
51:3
**conferred (2)**
43:21 44:2
**confident (1)**
59:16
**confirmation (4)**
32:2,13,15 40:17
**confirmed (1)**
27:19
**connection (1)**
53:12
**contact (3)**
18:13,16 28:21

**contacts (1)**
46:2
**contained (1)**
9:23
**contemporaneous ...**
24:10
**content (1)**
50:25
**content-specific (1)**
37:22
**context (2)**
47:6,15
**CONTINUED (2)**
54:12 62:12
**controlled (1)**
30:17
**conversation (13)**
17:13 18:6 37:23
　38:15,20,22 44:24
　45:2 48:12 49:16
　49:17 52:9,20
**conversations (9)**
12:8,13,15,17 45:9
　50:13 51:11 52:25
　57:4
**copies (1)**
31:23
**copy (5)**
3:13,16 31:25 42:20
　57:5
**CORPORATION ...**
2:9
**correct (26)**
11:20 29:10,21 31:17
　35:20 36:2 37:11
　39:7,14 41:7,11,13
　41:16,17 45:20
　48:15 51:24 54:16
　56:9 58:10 60:13
　60:20,21 61:3 62:9
　64:9
**correctly (2)**
53:23 61:6
**counsel (20)**
2:6,9 3:5,16 17:10
　28:25 32:5 39:24

41:10 51:11 52:9
52:14,15,15,18 53:2
59:14 60:16,22
65:13
**County (5)**
2:17 4:13 5:8 46:9
　66:5
**couple (1)**
45:17
**course (1)**
49:6
**court (19)**
1:2,18,21 3:12 17:8
　20:7 21:10 33:21
　34:20,22 39:11
　50:20,21,23 51:3,9
　51:15 52:3,4
**crime (2)**
23:15 55:22
**criminal (3)**
52:14,17 53:13
**Curulli (42)**
7:2,6,6,11 13:6 15:19
　22:14 24:16 25:22
　26:9 28:18,21 29:8
　29:16,19,20,22 30:2
　30:17 33:14 45:18
　45:20,23 46:2
　49:17 50:6,13 54:5
　54:24 55:8,12
　56:12,23,23 57:11
　57:17 58:8 59:2,4
　59:17 60:25 62:4
**Curulli's (6)**
13:5,9 14:3 28:15,19
　29:9
**custom (1)**
7:18

---
**D**

**D (3)**
3:2 64:2 65:15
**DA (2)**
34:25 39:7
**Danziger (7)**
1:8 2:11 17:23 18:3,7

46:23 47:25
**data (3)**
11:14 31:2 32:21
**date (7)**
1:12 20:12 34:14
　42:9 43:5 52:3,4
**David (2)**
2:6 4:20
**day (7)**
10:17,20 11:22,24
　12:4 64:19 66:19
**days (3)**
3:15 9:4 36:9
**day-to-day (1)**
6:7
**DA's (4)**
5:8 35:12,20 39:12
**DD5 (3)**
44:24,25 45:4
**decided (3)**
36:20 37:9 51:23
**deciding (1)**
38:25
**decision (14)**
19:16,18,22,24 35:11
　35:14,19 36:8,13,17
　37:16 49:8 52:7
　62:7
**Defendant (7)**
1:15 2:19 21:13
　28:25 31:4 34:18
　47:9
**Defendants (2)**
1:9 2:10
**Defendant's (4)**
20:4,20 40:14 42:24
**Defendant-52 (2)**
43:3,7
**defense (18)**
17:3,10,13 31:16,22
　32:5 39:23,24
　41:10 52:9,14,15,15
　52:17 53:2 59:14
　60:16,22
**Def's-35 (1)**
42:11

**Def-35/Photograp...**
65:10
**Def-52 (1)**
65:11
**Def-71 (2)**
34:12 65:9
**Def-73/buck (1)**
20:10
**Def-73/Bucksheet ...**
65:8
**Deluca (21)**
26:8 44:13 49:17
　50:7,14 53:25 54:4
　54:16,25 55:11
　56:8,13,18,22 57:2
　57:11,25 59:6,18
　61:22 62:2
**Deluca's (1)**
26:24
**Denzinger (1)**
44:3
**DEPARTMENT (1)**
2:10
**deposition (7)**
1:15 3:7,8,13 10:23
　51:19 54:22
**DEPUTY (1)**
2:18
**described (1)**
56:22
**description (5)**
25:14 27:24 56:19,25
　65:7
**detailed (1)**
43:17
**detained (1)**
41:20
**detective (7)**
1:7 2:11 17:22 31:6
　44:2 46:14,22
**detective's (1)**
27:20
**Diamond (1)**
1:20
**difference (1)**
36:3

**different (2)**
5:11 55:23
**direct (2)**
9:21,22
**directing (4)**
34:19 43:6,13 49:12
**disagree (1)**
38:3
**disclosure (1)**
53:24
**discount (1)**
41:2
**Discovery (1)**
11:8
**discuss (1)**
32:4
**discussing (1)**
59:16
**discussion (3)**
32:8 44:11 59:24
**discussions (6)**
10:10 33:2,4 37:15
    37:20 54:23
**dismiss (6)**
35:20 36:6 37:10
    38:5,24 39:13
**dismissal (2)**
35:17 39:3
**dismissed (10)**
19:10 34:6 35:6 36:7
    38:8,10,11 39:6,6
    39:14
**dismissing (2)**
35:24 36:2
**dispositive (1)**
41:2
**District (13)**
1:2,2 2:17,18 4:12,22
    7:18 11:13,15 12:6
    37:9 38:6 39:21
**document (5)**
12:25 20:21 34:12
    37:7 43:8
**documentation (2)**
49:20,25
**documents (6)**

11:11 13:2 40:9
    51:10 65:22,23
**DOE(S) (2)**
1:8 2:12
**domestic (2)**
6:17,22
**Donald (1)**
1:23 66:7,22
**Donnelly (6)**
1:8 2:12 31:5 47:9,10
    48:2
**door (4)**
43:20,22,23,25
**doubt (3)**
35:10 37:11,25
**drafted (1)**
11:15
**driving (2)**
28:3 31:11
**drove (1)**
24:21
**duly (3)**
4:3 64:5 66:11
**D-E-N-Z-I-N-G-E-...**
44:3

_____
**E**
**E (10)**
2:2,2 3:2,2 4:2 64:2
    65:2,15 66:2,2
**earlier (9)**
40:3,10 42:13 50:13
    52:24 54:14,22
    60:18 62:7
**Eastern (2)**
1:2 4:22
**effect (3)**
3:11,14 42:17
**eight (1)**
36:9
**Either (1)**
35:16
**employed (1)**
18:10
**ended (1)**
47:18

**entire (1)**
5:16
**Esq (71)**
1:17 2:6,9,14,19,21
    4:1,10 5:1 6:1 7:1
    8:1 9:1 10:1 11:1
    12:1 13:1 14:1 15:1
    16:1 17:1 18:1 19:1
    20:1 21:1 22:1 23:1
    24:1 25:1 26:1 27:1
    28:1 29:1 30:1 31:1
    32:1 33:1 34:1 35:1
    36:1 37:1 38:1 39:1
    40:1 41:1 42:1 43:1
    44:1 45:1 46:1 47:1
    48:1 49:1 50:1 51:1
    52:1 53:1 54:1 55:1
    56:1 57:1 58:1 59:1
    60:1 61:1 62:1 63:1
    64:1,15 65:1 66:1
**et (1)**
26:11
**event (1)**
15:23
**eventual (1)**
39:3
**eventually (1)**
34:6
**evidence (5)**
15:25 26:25 27:5,12
    52:22
**ex (2)**
33:15,18
**exact (3)**
11:24 15:17 23:6
**exactly (5)**
9:5 36:21 39:19 52:5
    59:7
**examination (8)**
4:6 53:9 54:12 62:12
    63:7 65:17 66:10
    66:12
**examined (1)**
4:5
**exculpatory (2)**
21:12 62:17

**exhibit (15)**
20:4,8,8,11 34:9,13
    42:4,8,11,25 43:4,7
    51:18 65:6,6
**exhibits (3)**
51:16 65:4,13
**extent (3)**
32:2 48:7 52:21
**eyewitness (5)**
13:24 14:23 23:2,20
    53:25

_____
**F**
**F (2)**
3:2 66:2
**faces (2)**
25:2,5
**fact (6)**
45:3 46:13,16 54:23
    58:12 62:2
**falling (1)**
6:15
**far (2)**
34:5 56:6
**February (2)**
5:9 9:13
**federal (2)**
1:19 4:21
**feel (1)**
48:14
**felonies (2)**
6:16,18
**felony (2)**
36:16 39:2
**file (26)**
9:23 10:16,20 11:10
    11:11,18,22 12:20
    13:19 14:15,18,21
    15:12,25 17:15
    21:10 24:10,15
    34:20,22,25 43:9
    49:18,21 59:19
    61:12
**filing (1)**
3:6
**find (3)**

32:9,14 38:9
**fingerprint (1)**
43:24
**first (7)**
4:3,15 9:15,24 37:6
56:22 64:4
**fit (1)**
56:25
**follows (1)**
4:5
**follow-up (2)**
45:17 53:8
**force (1)**
3:14
**foregoing (1)**
64:8
**form (1)**
3:20
**forth (1)**
66:11
**found (1)**
38:7
**frame (1)**
18:25
**friend (1)**
30:6
**front (1)**
37:7
**functions (1)**
5:11
**further (8)**
3:19 53:6 54:10
62:11 63:2,3 64:8
66:14

**G**

**gain (1)**
26:11
**gained (1)**
48:11
**garage (2)**
13:8,9
**gas (3)**
31:24 32:10,12
**general (2)**
11:3 39:18

**generate (1)**
58:21
**Germila (3)**
1:22 66:7,22
**getting (1)**
50:18
**give (1)**
13:3
**given (4)**
11:16 15:13 64:10
66:13
**go (9)**
6:23 8:22 12:24 16:6
23:17 27:3 58:14
58:20 61:21
**going (4)**
19:20 35:22 58:16,17
**Good (3)**
4:15,17,19
**Google (2)**
40:15,21
**gotten (1)**
24:19
**GRADY (29)**
2:21 7:24 8:6 10:15
11:2 12:10,14,24
16:3,6,8 21:15,22
34:18 37:17,21
38:12,18 39:15,19
48:6,16 49:10,14
59:21 60:2,9 61:23
63:5
**Grand (1)**
36:5
**grange (1)**
21:3
**guess (1)**
13:17

**H**

**H (2)**
4:2 65:2
**hand (1)**
66:19
**Handing (1)**
51:17

**handle (3)**
6:8 19:6 46:17
**handled (2)**
12:8 19:12
**handwriting (4)**
20:23,24 21:2 35:3
**happened (7)**
11:19 35:17 39:10
50:21 55:4 57:14
58:2
**happens (1)**
50:22
**hard (1)**
27:10
**health (1)**
33:24
**held (2)**
1:20 59:24
**helpful (3)**
32:10,14 41:3
**hereinbefore (2)**
64:11 66:11
**hereunto (1)**
66:18
**home (2)**
13:6,7
**hotel (2)**
31:25 40:16
**house (5)**
14:8 15:21 23:8
24:15 44:4

**I**

**identification (15)**
20:5,12 21:25 26:24
34:8,10,14 42:5,8
43:4 53:19,20,22
61:18 62:5
**identified (4)**
13:14 14:2 57:2,18
**identify (2)**
25:8 55:12
**incident (12)**
14:6 15:2 16:12
17:17,25 22:25
26:6 30:18 31:13

45:19 48:25 57:15
**include (1)**
6:17
**inculpatory (1)**
27:8
**indicated (2)**
60:11 62:6
**indicates (2)**
37:8,12
**indite (10)**
19:20 35:22 36:4,8
36:13,18,20 38:25
49:8 51:23
**inditing (2)**
35:23,25
**individual (2)**
58:21,22
**individuals (5)**
13:10 44:22 56:22,25
62:3
**information (25)**
9:16 16:17,21,23
21:12 26:11 28:17
31:15,19 32:3
37:18 39:24 40:21
48:8,17 49:9,11,15
50:19 51:14 52:11
60:10 62:17 65:22
65:23
**informed (5)**
4:23 14:13 44:17
50:20,22
**inside (2)**
21:6,10
**instructed (1)**
11:4
**interested (1)**
66:17
**investigate (2)**
40:6,8
**investigated (1)**
39:22
**investigating (1)**
17:23
**investigation (4)**
26:14,18 32:23 43:18

**involved (2)**
6:3 32:22
**involvement (4)**
6:25 7:4 9:3 10:12
**in-person (1)**
55:25
**Island (3)**
2:20 4:14 15:23
**issue (2)**
11:6 41:23
**issues (1)**
33:24
**items (2)**
13:11 33:11

**J**

**JOHN/JANE (2)**
1:8 2:12
**judge (3)**
3:12 31:12 36:7
**Judges (1)**
11:7
**June (1)**
52:3
**Jury (1)**
36:5

**K**

**Keen's (1)**
18:3
**kind (2)**
8:16 14:10
**KINGS (1)**
66:5
**knew (1)**
45:18
**know (56)**
5:4 7:14,15 8:21,23
9:5 10:7,8 14:7
17:12 18:15,20,23
21:23 22:6,9,11,12
24:24 27:7 28:3,4,5
28:8 33:9,10,12
34:3,5 35:16,21
39:8,9,10,21 40:13
42:19 46:14,15

47:21 48:11 52:5
53:3 54:8 55:19
56:6,7 57:17,23
58:2 59:7 61:3,7,15
61:20,23
**knowledge (8)**
25:21 28:7 31:9
46:12 48:23 52:23
54:3,9

**L**

**L (4)**
3:2,2 4:2 64:2
**La (68)**
1:17 2:19 4:1,10,15
5:1 6:1 7:1 8:1 9:1
10:1 11:1 12:1 13:1
14:1 15:1 16:1 17:1
18:1 19:1 20:1 21:1
22:1 23:1 24:1 25:1
26:1 27:1 28:1 29:1
30:1 31:1 32:1 33:1
34:1 35:1 36:1 37:1
38:1 39:1 40:1 41:1
42:1 43:1 44:1 45:1
46:1 47:1 48:1 49:1
50:1 51:1 52:1 53:1
54:1 55:1 56:1 57:1
58:1 59:1 60:1 61:1
62:1 63:1 64:1,15
65:1 66:1
**lack (1)**
58:7
**lasted (1)**
18:22
**LAW (2)**
2:4,10
**lawn (1)**
33:12
**learn (5)**
12:20 14:17 15:6,10
55:16
**learned (7)**
13:4,5,13 30:22 49:6
51:3 52:12
**leave (5)**

9:8,9,10 18:23 35:13
**left (6)**
9:10 19:10,11 35:12
35:18 36:23
**let's (1)**
50:19
**line (5)**
5:20 6:2,6,13 13:14
**lineup (13)**
22:3,5,7 25:20 53:17
54:2 55:17,20,24,25
60:19 61:21 62:4
**listed (1)**
21:11
**little (3)**
20:24 21:2 43:14
**LLP (1)**
2:4
**located (2)**
13:8 14:2
**location (1)**
22:18
**lock (4)**
13:11 28:8,11,12
**long (8)**
5:7,22 9:5 11:21 12:2
30:23 36:12 41:20
**look (3)**
41:21 43:10 51:15
**looking (2)**
14:10 51:18
**looks (3)**
42:15 51:19 58:22

**M**

**MALCOLM (2)**
1:7 2:11
**male (1)**
32:23
**males (1)**
32:21
**Manhattan (1)**
2:6
**Maps (2)**
40:15,21
**March (1)**

5:25
**mark (2)**
42:3,23
**marked (9)**
20:4,7,10,20 34:8,12
42:7,11 43:3
**marriage (1)**
66:16
**Maryland (10)**
16:12,24,25 17:15,16
17:25 40:24 49:20
49:23 51:5
**material (20)**
21:11,21 41:2 51:2
53:12,16,21 58:3,5
59:19 60:12,19,24
61:4,9,11 62:15,16
62:18,22
**matter (1)**
66:17
**mean (9)**
6:9 22:3 26:5 27:7
32:16 52:14 53:21
55:19 59:7
**Meaning (1)**
55:21
**meet (6)**
33:19 46:3,22 47:10
47:15 48:25
**mentioned (3)**
32:18 45:18 49:24
**met (3)**
7:10 47:4 49:3
**middle (2)**
9:7 37:2
**minute (1)**
60:17
**misdemeanors (1)**
6:16
**misheard (1)**
41:4
**MKB (1)**
1:6
**moment (1)**
43:10
**month (3)**

11:23 12:3 37:6
**months (3)**
9:4 18:21 36:15
**morning (3)**
4:15,17,19
**motion (4)**
36:6 38:5,17 39:7
**motor (3)**
30:13,14 33:10

**N**

**N (8)**
2:2,14 3:2 4:2,2,2
64:2 65:15
**name (4)**
4:8,16,19 32:11
**NASS (1)**
2:4
**natural (1)**
38:25
**need (3)**
36:13 48:14 54:17
**neighbor (3)**
27:18,20,22
**neighbor's (2)**
27:15,17
**never (5)**
16:15 17:7 32:19
41:12 49:3
**new (17)**
1:2,7,16,22,23 2:6,10
2:11,14,14,20 4:4
4:14,22 7:13 66:4,8
**non-conducive (1)**
43:24
**normally (1)**
58:19
**Notary (4)**
1:23 4:4 64:22 66:7
**note (4)**
21:6,10,19 22:12
**noted (1)**
61:11
**notes (2)**
10:19 27:20
**Notice (1)**

11:16
**notified (2)**
57:15,16
**November (1)**
66:19
**number (3)**
34:16 44:3 65:7
**NYPD (2)**
46:10,17

**O**

**O (4)**
3:2 4:2,2 64:2
**oath (2)**
3:11 5:5
**objection (61)**
6:23 7:23,24 9:18,19
10:15 11:2 12:10
12:22 15:4,9 16:6
16:19 17:2 18:4,14
21:15,22 22:4
23:17 27:3 28:16
29:7 32:24 33:16
33:25 37:4,13,17
38:12 39:8,15,25
41:25 42:18 44:9
45:7 46:4,11,20
47:20 48:7,16,22
49:10 50:4,10,16
51:6 52:13 55:5,14
55:18 56:10 57:21
58:4,12 59:21 60:2
60:15 61:2
**objections (1)**
3:20
**observed (1)**
13:7
**occurred (2)**
15:23 51:12
**Ocean (11)**
16:11,24,25 17:15,16
17:24 40:19,23
49:20,23 51:4
**October (2)**
1:12 5:24
**offer (1)**

21:3
**office (14)**
2:17 4:12 5:8 7:19
11:14 12:6 22:17
22:20 35:12,20
37:9 38:6 39:12,22
**officer (9)**
1:8,8 2:12,12 17:23
18:10,10 46:9,14
**officers (15)**
14:24 25:23 44:12
47:18 48:19 50:8
54:7,15,25 55:17,21
56:13 57:10,23
59:18
**offices (1)**
1:20
**official (1)**
58:18
**off-the-record (1)**
59:23
**okay (36)**
5:22 6:20 7:17 11:9
11:25 12:19 13:3
13:18 14:9 17:14
23:13 27:6,13,22
28:20 29:24 35:19
36:8,12 37:7 38:9
38:20 39:20 40:12
44:23 45:11 48:9
48:24 50:12 51:22
52:8 53:5 56:17,20
62:6,10
**once (2)**
22:22,22
**open (1)**
19:11
**opened (1)**
59:4
**operation (1)**
6:7
**Order (1)**
1:19
**original (3)**
3:8,16 32:21
**originally (1)**

49:22
**outcome (4)**
8:20 34:3 38:25
66:17
**outset (1)**
49:9

**P**

**P (3)**
2:2,2 3:2
**padlock (1)**
43:24
**page (4)**
43:15 65:7,17,23
**paperwork (3)**
9:24 48:13 49:22
**parameters (1)**
56:7
**part (5)**
15:21 21:3 34:20,22
34:25
**particular (1)**
5:12
**parties (3)**
1:18 3:6 66:15
**party (1)**
42:16
**pending (1)**
4:21
**Penn (1)**
2:5
**people (10)**
4:24 14:21,25 24:19
25:16 37:23 41:19
50:2 56:5 59:5
**perpetrators (7)**
43:25 44:6,14,16
45:5,6,10
**person (4)**
23:25 46:3 47:4
58:24
**phone (5)**
22:18,19 23:22 46:6
50:14
**photo (3)**
59:4,5,8

**photograph (8)**
13:23 42:7,12,15
54:16,18 59:4,17
**photographic (2)**
55:17,20
**photographs (23)**
44:5,8,10,13,19,20
44:21,22 45:5,6,9
49:25 54:2,4,6,19
54:24 55:9 57:6
58:21 60:24 61:21
62:3
**photo-array (10)**
55:22,23 56:3,3
57:24 58:7,14,18,25
59:10
**phrase (1)**
58:8
**physical (1)**
27:11
**pick (1)**
15:20
**picked (4)**
12:19 15:12 25:18,19
**pickup (1)**
33:6
**picture (6)**
14:4,5,9,10,14,14
**pictures (19)**
13:19,21,24 14:20,24
15:7,11 24:17,18
25:15,18,22 28:4
44:16 56:7,11,13,16
61:6
**place (5)**
2:20 4:11,13 58:23
64:11
**Plaintiff (2)**
1:4 2:4
**Plaintiff's (12)**
20:8,11 34:9,13 42:4
42:7,11,24 43:3,7
51:18 65:4
**plan (1)**
38:24
**planned (3)**

9:10 38:10,17
**plate (1)**
26:11
**Plaza (1)**
2:5
**please (2)**
4:8 42:21
**point (11)**
13:18 16:4 17:12
19:15,19 28:24
31:21 32:19 37:8
41:6 48:10
**police (20)**
1:7,8,8 2:11,12,12
11:17 13:16 14:24
23:11,11 26:3
27:19 41:22 55:8
55:10 57:3,14,16
58:19
**portion (1)**
36:25
**power (1)**
33:6
**practice (2)**
7:18 62:24
**prepare (1)**
10:22
**presence (1)**
54:7
**present (4)**
30:19 36:5 57:10
58:25
**previous (5)**
6:25 7:3 29:14 48:18
54:2
**printed (3)**
31:25 32:13,15
**prior (4)**
7:21 8:2 45:25 55:7
**privilege (6)**
12:10 37:18 38:22
48:8,17 49:11
**privileged (7)**
37:25 38:13,14,19
39:16 60:3,9
**Probably (1)**

12:4
**procedure (6)**
1:20 22:2 58:19,20
61:19 62:5
**property (16)**
13:9 14:3 15:20
24:20 28:5,15,19
29:4,9,11,17,19,23
29:25 30:6,9
**prosecute (2)**
7:5 36:15
**prosecuted (1)**
45:19
**prosecuting (3)**
6:8 47:19 51:20
**prosecution (9)**
6:3 18:11 30:20
31:22 47:2,13 49:7
50:9 53:13
**prove (3)**
35:8 37:11,24
**provided (8)**
14:24 16:13,15 17:19
21:13 27:23 32:19
40:21
**Public (4)**
1:23 4:4 64:22 66:7
**pull (2)**
13:7 27:21
**pulled (2)**
13:12 24:16
**pursuant (1)**
1:18
**put (9)**
21:6,16,18,19 22:9
22:11,12 60:12
61:12
**P.M (1)**
63:6

**Q**

**question (11)**
8:7,9,11 9:20 16:9
27:10 37:22 48:18
60:5,7 61:24
**questions (6)**

5:4 45:17 53:8 54:10
57:12 63:2
**quick (2)**
20:14 45:12
**quote (1)**
7:20

**R**

**R (69)**
2:2 3:2 4:1,2,2 5:1
6:1 7:1 8:1 9:1 10:1
11:1 12:1 13:1 14:1
15:1 16:1 17:1 18:1
19:1 20:1 21:1 22:1
23:1 24:1 25:1 26:1
27:1 28:1 29:1 30:1
31:1 32:1 33:1 34:1
35:1 36:1 37:1 38:1
39:1 40:1 41:1 42:1
43:1 44:1 45:1 46:1
47:1 48:1 49:1 50:1
51:1 52:1 53:1 54:1
55:1 56:1 57:1 58:1
59:1 60:1 61:1 62:1
63:1 64:1,2 65:1
66:1,2
**randomly (1)**
58:23
**reach (2)**
48:19,21
**reaction (1)**
21:3
**read (7)**
8:11 12:20 13:2 35:7
43:15 60:4,7
**reason (3)**
9:6 28:23 48:4
**reasonable (3)**
35:10 37:11,25
**recall (43)**
11:24 12:9 15:17
16:23 21:21 22:23
23:6,18 24:5 25:3,6
25:9 26:13,19,22,25
27:17,18 28:13
30:11,12,13,13

31:14 33:9,13
36:21 42:12 43:8
44:15,21 45:3,8
47:3 48:5 50:7,17
52:11 53:3,11,15
57:20,22
**recap (1)**
23:9
**receipt (1)**
51:9
**receipts (7)**
30:8 31:24 32:9,11
32:12 49:23 51:4
**receive (6)**
6:15 10:2 32:17
49:15,19,24
**received (19)**
9:23 10:20 11:8
24:10 28:17 31:23
40:10,10,25 42:13
43:9 44:20 49:19
49:22,24 51:8,10,13
52:22
**receiving (1)**
39:23
**recess (2)**
20:16 45:14
**recognize (1)**
20:21
**recognized (2)**
24:22 59:6
**recollection (5)**
18:17 21:9 25:13
28:10 33:7
**record (16)**
4:9 20:18 21:6,17,19
21:19 22:7,10,12,13
45:16 59:22,25
60:12 61:13 66:12
**records (1)**
23:12
**recount (1)**
26:18
**recounting (1)**
26:6
**recovered (1)**

28:6
**refer (2)**
21:8 22:5
**referenced (1)**
59:19
**referred-to (2)**
8:10 60:6
**referring (1)**
61:15
**refers (1)**
58:18
**refresh (1)**
33:7
**regarding (2)**
22:7 50:9
**related (1)**
66:14
**relation (1)**
61:8
**relevance (1)**
6:22
**remember (27)**
10:17 11:9,21,25
12:5 16:16 18:21
19:21,24 22:21
23:16 25:11 26:14
26:21,23 32:22
33:2,4 36:17 44:17
44:23 47:6,12
50:15,18 51:2
53:23
**remembering (1)**
61:5
**repeat (2)**
8:6,8
**report (3)**
17:10 26:3 41:22
**reporter (7)**
8:12 20:7,13 34:15
42:9 43:5 60:8
**Reporting (1)**
1:21
**reports (1)**
11:17
**representation (2)**
41:18 50:2

**represented (2)**
7:21 28:25
**REQUESTED (1)**
65:22
**reservation (1)**
31:25
**reserved (1)**
3:21
**respect (6)**
8:2 9:14 26:10 50:20
52:8 61:11
**respectfully (1)**
38:2
**respective (2)**
1:18 3:5
**result (1)**
51:9
**results (1)**
26:21
**retained (1)**
65:13
**retired (5)**
17:22 31:12 46:9,13
46:16
**revealed (1)**
59:14
**review (4)**
10:22,25 48:12 49:18
**Rhiannon (5)**
1:17 2:19 4:10,18
64:15
**Richmond (4)**
2:17 4:13 5:8 46:9
**right (17)**
15:14 21:20 22:25
23:3 29:3,5,11,18
32:4 35:24 36:10
40:4 43:13 55:4
58:20,23 61:10
**Robert (6)**
1:3 2:5 4:20 13:13,15
53:13
**role (5)**
5:12,14,15,18,23
**roles (1)**
5:13

**ROPER (1)**
2:4
**rule (1)**
11:3
**Rules (1)**
1:19
**running (1)**
39:3
**R-H-I-A-N-N-O-N...**
4:17

**S**

**S (7)**
1:8 2:2,13 3:2,2 4:2
65:2
**saw (3)**
25:4 27:20 56:19
**saying (2)**
16:11 29:24
**says (7)**
21:5 22:12 33:5 35:6
43:17 45:4 61:12
**scene (5)**
14:5,25 44:2 55:22
57:24
**sealing (1)**
3:6
**second (1)**
7:19
**see (9)**
20:24 21:5,7 25:2
30:8 33:21 35:3
42:21 46:3
**sense (1)**
62:18
**sentences (1)**
43:16
**September (1)**
52:4
**service (1)**
3:15
**set (2)**
66:11,18
**sex (1)**
6:19
**shed (12)**

13:8,11,12,25,25
14:2 24:20,20 28:9
28:15 33:13 43:23
**sheet (4)**
11:14 20:10 31:2
32:21
**short (2)**
20:16 45:14
**show (4)**
20:3,25 42:10 54:6
**showed (10)**
25:22 54:4,24 55:9
56:12,16,24 59:5,8
59:17
**showing (2)**
17:15 20:19
**shown (7)**
25:15 53:25 54:16
56:8 60:25 61:22
62:3
**signed (3)**
3:9,11,14
**similar (1)**
58:22
**sit (2)**
59:15 61:10
**six (3)**
36:15 56:4 58:23
**smiling (1)**
14:10
**solely (1)**
52:21
**somebody (6)**
18:15 25:18 42:16
55:13 57:18 58:24
**sorry (7)**
19:23 37:14 41:4
42:2 51:7 52:3 55:6
**sort (1)**
13:22
**sorts (1)**
33:11
**source (6)**
9:17 16:16,20,22
18:2 31:19
**speak (10)**

18:9 22:14 23:19,24
30:25 31:4 40:2
46:6 47:25 48:14
**speaking (3)**
12:5 50:6,7
**Special (2)**
5:21 6:14
**specific (6)**
6:10,12 38:24 44:24
45:8 48:4
**specifically (3)**
22:6 44:15 61:20
**specified (1)**
64:11
**specify (1)**
54:17
**spoke (3)**
17:22 22:21 50:15
**spoken (2)**
45:22 54:19
**squib (1)**
43:14
**SS (1)**
66:4
**stands (1)**
35:9
**starting (2)**
43:20,21
**state (5)**
1:23 4:4,8 66:4,8
**statement (13)**
13:16 15:13,18,19,22
16:17,20 18:3 27:4
27:9,9 29:15 40:18
**statements (3)**
27:16,18 40:14
**Staten (3)**
2:20 4:14 15:23
**STATES (1)**
1:2
**stations (3)**
31:24 32:10,12
**sticks (1)**
30:14
**STIPULATED (2)**
3:4,19

**stolen (5)**
29:4,11,25 30:11
33:8
**stopped (1)**
9:7
**story (5)**
23:10 25:13,25 26:2
26:4
**Street (2)**
1:21 2:13
**strict (1)**
62:18
**stuck (1)**
33:10
**stuff (1)**
33:12
**Stuyvesant (2)**
2:20 4:13
**Subscribed (1)**
64:18
**subsequent (1)**
25:19
**substance (5)**
8:3 15:18 23:7 32:7
58:9
**substantive (3)**
51:2,14 52:19
**Suite (2)**
1:21 2:5
**sum (4)**
8:3 15:18 23:7 32:7
**summary (1)**
43:17
**supervisor (2)**
10:4,11
**supervisors (1)**
10:6
**sure (5)**
21:25 36:3 43:11
55:25 59:20
**surveillance (1)**
28:2
**sworn (5)**
3:9 4:3 64:5,18 66:11
**synopsis (2)**
13:4,17

**T**

**T (7)**
3:2,2 4:2 64:2 65:2
66:2,2
**take (6)**
20:14 29:22 30:6,22
44:5 45:12
**taken (9)**
1:17 14:5,7 20:17
24:17 33:18 43:25
44:10 45:15
**talk (1)**
47:17
**talking (3)**
27:11 54:18 56:11
**target (1)**
58:22
**tax (1)**
44:3
**technically (2)**
62:22,24
**tell (4)**
6:6 8:3 23:5 32:7
**telling (1)**
50:25
**terms (3)**
36:18 50:23 62:20
**testified (12)**
4:5 14:23 40:3,9
42:13 47:24 50:12
52:10,23 54:14
60:18 61:17
**testify (1)**
64:5
**testifying (2)**
53:11,15
**testimony (7)**
5:5 17:21 29:15 58:6
64:6,10 66:13
**Thank (4)**
5:3 42:22 63:4,5
**thing (1)**
14:11
**things (1)**
33:14

think (4)
17:23 27:10 38:23
60:23
thinks (1)
55:12
thought (7)
19:9 23:14 25:17
27:4 29:18 56:25
60:18
time (26)
1:13 3:21 10:11 14:6
16:12 17:16,25
18:25 19:19 24:3,4
25:24 28:24 30:18
30:19 31:12,23
38:7 39:4 40:15,24
41:14,15 44:5
48:10 64:10
times (2)
40:14 50:15
TIMOTHY (2)
1:8 2:12
today (2)
59:15 61:10
today's (1)
10:23
told (3)
23:10 29:19 33:17
tools (1)
33:12
Tortora (29)
1:3 2:5 4:21,24 6:4
6:21,24 9:15 13:13
13:15,23 14:4
15:13 16:11 17:24
23:14 25:20 27:2
29:15,21 30:6
31:10,17 33:19
47:2,13 48:24
53:13 57:2
Tour (68)
1:17 2:19 4:1,10,15
5:1 6:1 7:1 8:1 9:1
10:1 11:1 12:1 13:1
14:1 15:1 16:1 17:1
18:1 19:1 20:1 21:1

22:1 23:1 24:1 25:1
26:1 27:1 28:1 29:1
30:1 31:1 32:1 33:1
34:1 35:1 36:1 37:1
38:1 39:1 40:1 41:1
42:1 43:1 44:1 45:1
46:1 47:1 48:1 49:1
50:1 51:1 52:1 53:1
54:1 55:1 56:1 57:1
58:1 59:1 60:1 61:1
62:1 63:1 64:1,15
65:1 66:1
traffic (1)
40:22
transcript (2)
64:9,9
trial (2)
3:21 8:22
Tricia (7)
7:2,6,10 13:5,6 25:15
25:17
tried (1)
18:15
truck (14)
13:7,10,25 24:16,17
24:18 26:10,12,15
27:21,23 28:3 33:7
44:21
true (3)
6:20 64:9 66:12
truth (1)
64:5
try (1)
18:13
turn (2)
62:21,22
turned (1)
11:12
twenty (1)
52:3
two (2)
32:21 43:15
type (1)
6:12
typically (2)
47:17,21

U

U (2)
3:2 4:2
ultimate (1)
34:3
understand (1)
16:8
understanding (12)
55:3,7,15 56:15,21
57:4,13 59:3,3
62:14,16,19
understood (1)
62:10
UNITED (1)
1:2
unquote (1)
7:20
unsigned (1)
3:13
Usually (2)
10:6 56:4

V

various (5)
9:24 11:17 13:11
33:11 47:16
vehicle (1)
31:11
versus (1)
4:24
victim (4)
7:7 10:13 29:3 30:2
Victims (2)
5:21 6:14
video (6)
16:14,15 17:14 32:18
41:6,8
view (2)
15:2 57:25
viewed (1)
43:9
Vincent (1)
7:6
violence (2)
6:18,22
vis-a-vis (1)

36:18
VMS (1)
1:6

W

W (1)
2:9
waived (1)
3:8
want (1)
8:13
wanted (1)
48:11
washer (1)
33:6
way (2)
46:18 66:16
wedding (5)
25:16,23 56:16,24
57:6
week (1)
11:22
weeks (1)
9:4
went (4)
9:8 18:23 24:19
32:16
WHEREOF (1)
66:18
witness (21)
1:16 3:9,15,17 4:3
8:13 16:7 20:19
22:24 37:14 42:2
45:4 46:17,19 51:7
55:6 58:15 63:7
66:10,13,18
witnesses (1)
50:8
wooden (3)
43:20,22,23
words (1)
23:6
writing (1)
13:23
written (1)
35:15

**wrote (1)**
59:12

---
### X
**X (4)**
1:3,10 65:2,15

---
### Y
**year (2)**
5:16 7:8
**York (16)**
1:2,7,16,22,24 2:6,10
  2:11,14,14,20 4:4
  4:14,22 66:4,8

---
### Z
**ZACHARY (1)**
2:9
**Zelman (31)**
2:6 4:7,20 11:6 12:12
  16:4 20:14,18
  21:16 34:7 37:19
  38:2,14 39:17,20
  42:3,23 45:12,16
  48:9 49:12 52:17
  53:5 54:11,13
  56:12 59:25 60:4
  62:10 63:3 65:18

---
### 1
**1 (5)**
3:16 20:8,11 51:19
  65:8
**1-3 (2)**
1:8 2:13
**10:40 (1)**
1:13
**100 (1)**
2:13
**10007 (1)**
2:14
**10123 (1)**
2:6
**10301 (2)**
2:20 4:14
**11241 (1)**

---
1:22
**12:18 (1)**
63:6
**12:30 (1)**
40:19
**12:50 (1)**
40:19
**130 (2)**
2:20 4:13
**14 (1)**
2:5
**15-CV-3717 (1)**
1:6
**16 (1)**
1:21
**18th (1)**
52:4

---
### 2
**2 (3)**
34:9,13 65:9
**20 (2)**
64:19 65:8
**2004 (1)**
2:5
**2009 (2)**
5:9,10
**2010 (1)**
5:24
**2014 (12)**
5:2,10,15,19 7:9 9:11
  18:24 19:3,8,8,13
  52:6
**2015 (2)**
4:25 9:13
**2016 (1)**
5:25
**2017 (2)**
1:12 66:19
**27 (1)**
1:12

---
### 3
**3 (4)**
42:4,8,11 65:10
**30 (1)**

---
3:15
**30th (1)**
66:19
**30-30 (3)**
39:4,6,14
**34 (1)**
65:9

---
### 4
**4 (5)**
42:25 43:4,7 65:11
  65:18
**4th (2)**
52:2,6
**42 (1)**
65:10
**43 (1)**
65:11

---
### 5
**52 (1)**
42:24
**53 (1)**
65:19
**54 (1)**
65:18

---
### 6
**62 (1)**
65:19

---
### 7
**71 (2)**
34:18,20
**73 (2)**
20:4,20

---
### 9
**907 (1)**
1:21
**917500 (1)**
44:4
**918 (1)**
21:3

---