UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------

ROBERT TORTORA,

                          Plaintiff,                    **MEMORANDUM & ORDER**
                                                        15-CV-3717 (MKB)

          v.

CITY OF NEW YORK, POLICE DETECTIVE
MALCOLM DANZINGER, POLICE OFFICER
TIMOTHY DONNELLY and POLICE OFFICERS
JOHN/JANE DOES # 1–3,

                          Defendants.

-------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

          Plaintiff Robert Tortora commenced the above-captioned action on June 25, 2015,

against Defendants City of New York (the "City"), Police Detective Malcolm Danzinger

("Detective Danzinger"), Police Officer Timothy Donnelly ("Officer Donnelly"), and John

and/or Jane Doe Police Officers #1–3, (Compl., Docket Entry No. 1), and filed a Second

Amended Complaint on September 14, 2016, asserting claims pursuant to 42 U.S.C. § 1983 for

excessive pre-arraignment detention, false arrest, malicious prosecution, denial of right to a fair

trial, failure to intervene, and claims against the City for municipal liability.  (Second Am.

Compl. ("SAC") ¶¶ 22–84, Docket Entry No. 24.)  Plaintiff also asserts claims under New York

state law for malicious prosecution, negligent infliction of emotional distress, intentional

infliction of emotional distress, pre-arraignment delay, and *respondeat superior* liability as to his

state law claims.  (*Id.*)  Plaintiff's claims arise from his arrest on May 2, 2014 for burglary.

          Currently before the Court is Defendants' motion for summary judgment as to all of

Plaintiff's claims, and Plaintiff's cross-motion for partial summary judgment as to his excessive

pre-arraignment detention claim and his motion for spoliation sanctions.[1]  For the reasons set

forth below, the Court grants Defendants' motion for summary judgment and denies Plaintiff's

motions for partial summary judgment and for sanctions.

## I.    Background

### a.    Factual background

The following facts are undisputed unless otherwise noted.

#### i.    The May 1, 2014 incident

On May 1, 2014, while Samantha Deluca was babysitting for Tricia Curulli[2] ("Mrs.

Curulli"), a retired NYPD officer,[3] at 350 Beach Road (the "Curulli home"), in Staten Island,

New York, she observed an incident at the Curulli home (the "May 2014 Incident").  (Defs. Rule

56.1 Statement of Undisputed Material Facts ("Defs. 56.1") ¶ 1, Docket Entry No. 60-18.)

Deluca observed two men ("the perpetrators") walk towards the backyard of the Curulli home

and proceed to enter the shed located in the backyard.  (*Id*. at ¶¶ 2–3.)  Deluca observed that one

of the perpetrators had a "very distinct beard that looked like Santa Claus."[4]  (Deluca Dep.

---

[1]  (Defs. Cross-Mot. for Summ. J. ("Defs. Mot."), Docket Entry No. 60; Defs. Mem. in Supp. of Defs. Mot. ("Defs. Mem."), Docket Entry No. 60-17; Pl. Cross-Mot. for Partial Summ. J. ("Pl. Mot."), Docket Entry No. 65; Pl. Mem. in Supp. of Pl. Mot. ("Pl. Mem."), Docket Entry No. 66.)

[2]  Neither Deluca nor Mrs. Curulli are parties to this action.

[3]  Tricia Curulli is a retired NYPD officer and worked at the 122nd Precinct where Plaintiff was arrested.  (Deluca Dep. 15–16, annexed to Pl. Mot. as Ex. C, Docket Entry No. 65-3.)

[4]  Defendants' 56.1 statement states that Deluca observed a man with a "very distinct beard that looked like Santa Claus."  (Defs. 56.1 ¶ 1.)  Plaintiff concedes that Deluca testified to this fact, but asserts that Deluca also testified that she could not remember the hair or clothing of the two perpetrators.  (Pl. Resp. to Defs. 56.1 ¶ 5, Docket Entry No. 69.)  A review of Deluca's deposition testimony indicates that Deluca testified that she did not recall what the perpetrators wore.  (Deluca Dep. 29–31.)  Because Plaintiff concedes that Deluca testified to this description,

31:21–32:6, annexed to Pl. Mot. as Ex. C, Docket Entry No. 65-3.)  Using her cellular telephone, Deluca took a photograph of the backs of the perpetrators and a photograph of the truck that the perpetrators drove when leaving the Curulli home.  (Pl. Rule 56.1 Statement of Undisputed Material Facts ("Pl. 56.1") ¶ 5, Docket Entry No. 67; Deluca Dep. 29–31.)  Deluca took the photograph of the perpetrators' backs "real fast in motion, so [the photograph] came out blurry." (Deluca Dep. 30:12–21.)  During the May 2014 Incident, Deluca sent a text message to her mother, who was with Mrs. Curulli, informing her that two perpetrators had entered the shed. (Defs. 56.1 ¶ 6.)  When Mrs. Curulli returned home she reported the May 2014 Incident to the 122nd Police Precinct (the "Precinct").  (Pl. 56.1 ¶¶ 9–10.)

At some unspecified time, but before the arrival of the police, Mrs. Curulli asked Deluca to describe the perpetrators.  (Deluca Dep. 39:25–40:3.)  After Deluca explained that one of the perpetrators looked like Santa Claus and had a white beard, Mrs. Curulli "took out her wedding photos . . ." and "showed [Deluca] a picture of [Plaintiff] to clarify if that was the guy who [Deluca] was talking about."  (Deluca Dep. 40, 41.)  Deluca identified Plaintiff in the wedding album photograph after only a "second" of looking at Mrs. Curulli's wedding album.  (Deluca Dep. 40:7–13.)

At some unspecified time after this exchange, police officers arrived at the Curulli home. (Deluca Dep. 48.)  The parties dispute whether Deluca gave the officers the photograph of the perpetrators' backs that she took on her cellular telephone.  (Pl. 56.1 ¶¶ 5–6; Defs. Resp. to Pl. 56.1 ("Defs. Resp.") ¶ 6, Docket Entry No. 72-2.)  Deluca testified at her deposition that she spoke with the officers and showed them the photographs that she took on her cellular telephone,

---

the Court deems undisputed the fact that one of the men had a "very distinct beard that looked like Santa Claus."

but could not recall whether the officers made copies of the photographs. (Deluca Dep. 49:23–50:2, 54,55.)

On May 1, 2014, Detective Kryzsztoff Kania, a member of the Precinct's Evidence Collection team, went to the Curulli home to collect evidence from the May 2014 Incident. (Kania Dep. 7–9, annexed to Pl. Mot. as Ex. G, Docket Entry No. 65-7.) Detective Kania prepared an Evidence Collection Report (the "Evidence Collection Report") dated May 2, 2014, that notes that the "babysitter [Deluca] who was in the house at the time of a burglary did take photos of the perpetrators," but the report does not provide further details. (Evidence Collection Report dated May 2, 2014, annexed to Pl. Mot. as Ex. H, Docket Entry No. 65-8; Kania Dep. 7–9.) The Evidence Collection Report does not specify the content of the photographs, *i.e.*, whether they were of the backs of the perpetrators or the truck that the perpetrator's used to leave the Curulli home. (Evidence Collection Report.) Detective Kania did not personally review or collect the photographs, but noted on the Evidence Collection Report that Deluca took photographs of the perpetrators because one of his colleagues told him that she had taken photographs. (Kania Dep. 12, 13.) Kania did not indicate on the Evidence Collection Report whether any officers collected the photographs. (Evidence Collection Report.)

The "precinct detective squad received a telephone call of a burglary at [the Curulli home]." (Danzinger Dep. 33:21–35:25.) Detective Danzinger reported to the Curulli home to investigate the May 2014 Incident on the same day.[5] (Defs. 56.1 ¶ 10.) Mrs. Curulli had

---

[5] Although Detective Danzinger testified that he arrived on May 1, 2014, the day of the incident, (Danzinger Dep. 31–35), the parties stipulate that Detective Danzinger arrived on May 2, 2014 to the Curulli home. However, based on the Court's review of the record, in particular Detective Danzinger's testimony, (Danzinger Dep. 31), and a supporting police report, (City Investigation Document dated May 2, 2014), it appears that Detective Danzinger conducted his

previously worked at the Precinct as a police officer, prior to her retirement, and Detective

Danzinger had worked at the Precinct at the same time as Mrs. Curulli. (Danzinger Dep. 15–18.)

Detective Danzinger did not know that Mrs. Curulli was the complaining victim when he arrived

at the Curulli home.[6] (Def. 56.1 ¶ 8.) When Detective Danzinger arrived, Mrs. Curulli

informed him that the perpetrators had broken into the shed, (Defs. 56.1 ¶ 12), and had stolen a

silver boat engine and a black and red generator, (Police Follow-up Informational Report dated

May 1, 2014, annexed to Defs. Mot. as Ex. C., Docket Entry No. 60-4). The officers conducted

a search of the shed and observed that the boat engine and generator were missing. (Police

Follow-up Informational Report dated May 1, 2014.) Mrs. Curulli told Detective Danzinger that

the stolen property belonged to her.[7] (Danzinger Dep. 63:24–64:4.)

     Deluca and Curulli showed Detective Danzinger a photograph of Plaintiff, (Danzinger

Dep. 46), and Deluca informed Detective Danzinger that Plaintiff was one of the perpetrators

that she saw in the backyard, (Danzinger Dep. 49:23–50:25). Deluca told the officers that she

had observed the men through the window, and saw the face of one of the perpetrators.

(Danziger Dep. 50:18–20, 55:1–5; Deluca Dep. 49.) Deluca signed the photograph of Plaintiff

---

investigation on May 1, 2014 and that the parties incorrectly identified the date of Detective
Danzinger's investigation.

    [6] Plaintiff admits this fact based on Detective Danzinger's testimony, but contends that
"given the admitted social history between [D]etective Danzinger and Ms. Curulli, the statement
strains cred[ibility]. (Pl. 56.1 ¶ 8.)

    [7] Plaintiff disputes this fact and cites to the deposition of Rhiannon La Toure, the
Assistant District Attorney that was assigned to Plaintiff's criminal case. (Pl. Resp. to Defs. 56.1
¶ 16.) ADA La Toure testified that she received information from Ms. Curulli that the property
that was removed belonged to Plaintiff. (R. La Tour Dep. 28, annexed to Pl. Mot. as Ex. B,
Docket Entry No. 65-2.)

from Mrs. Curulli's wedding album and identified him as the "person [she] saw standing outside in the backyard in the shed . . . . " (Deluca Dep. 108.) In addition to the photograph, Deluca described the perpetrator as a "6'1, balding, older man with a beard." (Danzinger Dep. 53:1–5; Deluca Dep. 58.) At his deposition, Detective Danzinger testified that he was never shown or provided with any photographs of the perpetrators acting or committing the alleged burglary.[8] (Danzinger Dep. 54.)

### ii. Plaintiff's arrest

On May 2, 2014, Plaintiff arrived at the Precinct after being summoned by two officers, and Detective Danzinger arrested Plaintiff at the Precinct and charged him with burglary. (Defs. 56.1 ¶ 19; Dep. of Robert Tortora ("Tortora Dep.") 48–49, annexed to Pl. Mot. as Ex. D, Docket Entry No. 65-4.) Plaintiff waived his *Miranda* rights and willingly shared with Detective Danzinger that his close friend Vincent Curulli ("Mr. Curulli"), the ex-husband of Mrs. Curulli, had asked him just a week prior, to go to the Curulli home and retrieve the property that was removed on the day of the May 2014 Incident. (*Id.* ¶¶ 21–22.) However, Plaintiff told Detective Danzinger that he was innocent and had been in Ocean City, Maryland on the date of the May 2014 Incident. (*Id.* ¶ 25; Danzinger Dep. 88:9–12, 142:14–17.) Plaintiff had no physical proof to support his claim that he was out of town, (Tortora Dep. 53), but Detective Danzinger gave Plaintiff "the benefit of the doubt," and called the hotel in Maryland to corroborate Plaintiff's

---

[8] Detective Danzinger noted in a police complaint dated May 1, 2014, that Deluca gave him "pictures of the [perpetrators'] truck in the driveway," that she took on her cellular telephone. (Complaint Follow-Up Form dated May 1, 2014, annexed to Defs. Mot. as Ex. D, Docket Entry No. 60-5.) Detective Danzinger did not indicate in the complaint whether or not Deluca took photographs of the perpetrators nor did he state that she provided any photographs of the perpetrators other than the photograph that Ms. Curulli retrieved from her wedding album. (*Id.*)

alibi, (Danzinger Dep. 136–140). Detective Danzinger called the hotel, and although at his deposition he could not recall who he spoke with at the hotel, he recalled that the individual told him that they "[didn't] know [Plaintiff] and [with respect to the] video [footage,] they didn't know [anything] about [it]." (Danzinger Dep. 137:14–17.) Detective Danzinger requested a receipt of Plaintiff's stay but an employee of the hotel told him that "they couldn't supply [him] with any information," over the telephone.[9] (Danzinger Dep. 139.)

On the day of Plaintiff's arrest and while in custody at the Precinct, Plaintiff called his friend, Retired Detective Richard Keane, and requested that Keane "help [him]." (Tortora Dep. 54:6–14.) Shortly thereafter, Keane arrived at the Precinct and explained to Detective Danzinger that he could provide Plaintiff with an alibi as the two "had just gotten back from Ocean City, Maryland." (Richard Keane Dep. 13–14, annexed to Pl. Mot. as Ex. E, Docket Entry No. 65-5.) Keane testified that Detective Danzinger responded, "I know but there's nothing I can do about it."[10] (Keane Dep. 14.) Detective Danzinger does not recall the substance of his conversation

---

[9] Plaintiff alleges that hotel employees at Howard Johnson Hotel in Ocean City, Maryland indicated that Detective Danzinger never called the hotel to inquire about the surveillance footage, (Pl. 56.1 ¶ 25), and in their sworn statements, two hotel employees state that that they did not speak with Detective Danzinger and "[did] not recall" whether they worked on May 1, 2014, May 2, 2014, or May 3, 2014. (Hotel Employees Aff., annexed to Pl. Mot. as Ex. J, Docket Entry No. 65-10.)

[10] Keane also testified that after leaving the Precinct, he called Denny's, the restaurant where he allegedly ate with Plaintiff on the day of the May 2014 Incident, to see if the restaurant had any video footage from the date and time of the alleged burglary. (Keane Dep. 15.) Keane obtained the name and number of an employee at Denny's, but not a copy of the video footage, and returned to the Precinct to provide the information to Detective Danzinger. (Keane Dep. 15.) Keane testified that Detective Danzinger declined to take the contact information of the Denny's employee and told him that inquiring about video footage was "a job for a defense attorney." (Keane Dep. 15.) At his deposition, Detective Danzinger did not recall anyone offering to show him a video providing proof that Plaintiff was not in the state at the time of the incident, nor does he recall declining any offer to view any such video. (Danzinger Dep. 125:8–18.)

with Keane, (Danzinger Dep. 93:10–13), but maintains that he never made such a statement to Keane. (Danzinger Dep. 95.)

Shortly thereafter, at an unspecified time, Plaintiff agreed to conduct a controlled call with Mr. Curulli, and Detective Danzinger transported Plaintiff to the Staten Island District Attorney squad's office to conduct the call.[11] (Tortora Dep. 63, 64; Danzinger Dep. 102–104.) In light of Plaintiff's statement that Mr. Curulli had asked him to retrieve the allegedly stolen property a week prior, Detective Danzinger hoped to determine whether the property was in fact taken by someone else. (Danzinger Dep. 104.) During the call, Mr. Curulli denied that he had any knowledge of the stolen items and eventually hung up on Plaintiff. (Tortora Dep. 63.) After the call, Plaintiff and Detective Danzinger returned to the Precinct where Deluca identified Plaintiff from a lineup with five other individuals.[12] (Tortora Dep. 65:1–5; Danzinger Dep. 112–114, 117; Complaint Follow Up Informational Report, annexed to Defs. Mot. as Ex. H, Docket Entry No 60-9; Lineup Administration Report dated May 2, 2014 (Lineup Administration Report"), annexed to Defs. Mot. as Ex. I, Docket Entry No. 60–10.)

Detective Danzinger does not recall what time he left the Precinct on May 2, 2014,

---

[11] The call was arranged at the Staten Island District Attorney's squad because the Precinct did not have the "facility" for Plaintiff to conduct the call. (Danzinger Dep 104:15–18.)

[12] Plaintiff disputes that Deluca identified him in a lineup on May 2, 2014. (Pl. Resp. to Defs. 56.1 ¶ 40.) At her deposition, Deluca pointed to a filler when asked to identify the individual that she identified from the lineup on May 2, 2014. (Pl. 56.1 ¶¶ 12–13; Deluca Dep 86.) However, Deluca later indicated that she was mistaken and corrected her testimony to indicate that she identified Plaintiff in the lineup. (Deluca Dep. 113.) Reports from the lineup confirm that Deluca identified Plaintiff at the lineup. (Deluca Dep. 117; Tortora Dep. 65–66; Complaint Follow Up Informational Report, annexed to Defs. Mot. as Ex. H, Docket Entry No 60-9; Lineup Administration Report, dated May 2, 2014, annexed to Defs. Mot. as Ex. I, Docket Entry No. 60–10.)

(Danzinger Dep. 96:24–97:3), but he does not believe that he saw Plaintiff on May 3, 2014 (*Id.* at 99). On May 3, 2014, Detective Danzinger met with the District Attorney to share the details of the case and sign a criminal court complaint (the "Criminal Complaint").[13] (*Id.* at 127–28, 133–34.)

The parties dispute at what time Plaintiff was transported to Central Booking. Plaintiff alleges that he was transported to Central Booking on May 3, 2014 at 8:57 AM, (Pl. 56.1 ¶ 43), but Defendants maintain that Plaintiff was transported to Central Booking at 10:05 PM on May 2, 2014, (Defs. Resp. to Pl. 56.1 ¶ 43). The parties agree that Plaintiff was arraigned on Sunday, May 4, 2014, at 10:38 AM and that Plaintiff was detained for approximately forty-nine hours and eight minutes. (Defs. 56.1 ¶¶ 44–45.)

On September 18, 2014, the criminal charges against Plaintiff were dismissed on a motion of the Richmond County District Attorney's Office. (Richmond County District Attorney dated Oct. 20, 2014, annexed to Pl. Mot. as Ex. N, Docket Entry No. 65-14.)

### iii. The December 2014 Facebook post

In a December of 2014 Facebook post to Mrs. Curulli, Officer Donnelly, Mrs. Curulli's former colleague and an officer from the Precinct, referred to an individual who was in custody

---

[13] At his deposition Detective Danzinger could not recall the name of the Assistant District Attorney he met with nor could he recall the substance of what he discussed with the Assistant District Attorney. (Danzinger Dep. 127.) At her deposition, Rhiannon La Tour, the Assigned Assistant District Attorney that handled Plaintiff's criminal case from May to August of 2014, testified that when she was assigned to the case, she received a file containing the "District Attorney's office data sheet, the Complaint drafted by an Assistant District Attorney, the Notice given at that arraignment, [and] various police reports." (R. La Tour Dep. 11, annexed to Pl. Mot. as Ex. B, Docket Entry No. 65-2.) The file also included Plaintiff's statements to the police, including (1) that Mr. Curulli had asked Plaintiff to pick up the property that was removed on the day of the May 2014 Incident, and (2) that Plaintiff was out of town in Ocean City, Maryland during the May 2014 Incident. (R. La Tour Dep. 15:17–23; 16.)

in Staten Island (the "December 2014 Facebook Post"). (Pl. 56.1 ¶ 21.) In the Facebook post,

Officer Donnelly wrote in pertinent part:

> But as I'm putting two and two together all I have to say is that your
> ex-husband is a big f****** d*** . . . . Fast forward several months
> . . . we have a perp who throws his name out think he could try and
> get something in return . . . I said no f****** way, you're a d***
> and so is your friend and f*** you, wrong name to use and now your
> day has just gotten longer . . . As a matter of fact you won't see the
> f****** judge for a couple of days . . . .

(Donnelly Facebook Post dated Dec. 19, 2014, annexed to Pl. Mot. as Ex. L, Docket

Entry No. 65-12.)

Officer Donnelly denies that he was referring to Plaintiff in the December 2014 Facebook

Post. (Pl. 56.1 ¶ 22.) During his deposition, Officer Donnelly testified that his comment was

made in reference to a perpetrator that was under arrest at the 123rd Precinct, another precinct in

Staten Island, New York. (Donnelly Dep. 51:20–52:2, annexed to Pl. Mot. as Ex. L, Docket

Entry No. 65-12.) Officer Donnelly could not recall the perpetrator's name, but he testified that

one day he was walking past the cell at the 123rd Precinct and a perpetrator "said by the way . . .

if this helps out, I know Vincent Curulli." (Donnelly Dep. 53.) Donnelly responded "that name

is not going to help you out here, fellah." (Donnelly Dep. 53– 54.) Donnelly testified that he

had no further interaction with the perpetrator. (Donnelly Dep. 53– 54.) Donnelly maintains that

his Facebook post was sent to Mrs. Curulli to make her feel better amidst her divorce

proceedings with Mr. Curulli. (Donnelly Dep. 57.)

When asked about Officer Donnelly at his deposition, Plaintiff testified that he had one

encounter with Officer Donnelly at the Precinct and none at the 123rd Precinct. (Tortora Dep.

77.) Plaintiff did not testify that he had any conversation with Officer Donnelly about Mr.

Curulli nor did he testify that Officer Donnelly threatened to delay his arraignment.[14] (Tortora Dep. 77.)

### iv. The Second Amended Complaint

The Second Amended Complaint asserts both state and federal claims against Defendants. (SAC.) Plaintiff asserts (1) a section 1983 claim for excessive pre-arraignment detention and a state claim for pre-arraignment delay, (*id.* ¶¶ 52–58, 70–73); (2) a section 1983 claim for false arrest, (*id.* ¶ 24); (3) a section 1983 and state law claim for malicious prosecution, (*id.* ¶¶ 31, 41); (4) a section 1983 claim for denial of his right to a fair trial, (*id.* ¶¶ 48–51); (5) a section 1983 claim for failure to intervene, (*id.* ¶¶ 74–84); (6) state law claims for intentional infliction of emotional stress and negligent infliction of emotional distress, (*id.* ¶¶ 59–64); (7) *respondeat superior* liability against the City, (*id.* ¶¶ 65–69); and (8) municipal liability under *Monell* against the City, (*id.* ¶¶ 8–11, 15–16).

Plaintiff seeks compensatory damages, punitive damages, attorneys' fees and costs, and interest in connection with his arrest on May 2, 2014.

## II. Discussion

### a. Standard of review

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant

---

[14] Plaintiff testified that while he was under arrest at the Precinct, Officer Donnelly, while on the telephone, turned to Plaintiff to ask him if his name was Paul. (Tortora Dep. 77.) When Plaintiff said no, Officer Donnelly hung up the telephone. (Tortora Dep. 77.) Plaintiff testified that his friend, Neil Garone, later informed Plaintiff that an attorney had called asking if Plaintiff was at the Precinct. (Tortora Dep. 77.) Plaintiff believes that the attorney was on the telephone when Officer Donnelly inquired about his name. (Tortora Dep. 77, 78.) Plaintiff did not have any further encounters with Officer Donnelly.

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018); *see also Cortes v. MTA NYC Transit*, 802 F.3d 226, 230 (2d Cir. 2015). The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (first quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010); and then citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)). A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment. *Id.* The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the nonmoving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

### b. Spoliation of evidence

Plaintiff contends that the photograph that Deluca took of the backs of the two perpetrators during the May 2014 Incident was never produced in the criminal matter or in this action, and as a result, Plaintiff is entitled to (1) a special instruction to the jury regarding Defendants' conduct and (2) an award of attorney's fees in connection with his spoliation motion. (Pl. Mem. 15.) In support of his spoliation motion, Plaintiff argues that Deluca's photograph is "critically relevant" to this action because it provides "evidence as to who in fact went" to the Curulli home on May 1, 2014, (*id.* at 15–16), and Defendants intentionally lost or destroyed this evidence which "warrants the strongest sanction available to the Court, the striking of [Defendants'] answer," (*id.*).

Defendants argue that they were "never in possession, custody, and control of [the] photo[graph]," and that, in any event, Plaintiff "has not met the requisite elements to prove spoliation, and thus, his motion for spoliation sanctions should be denied." (Defs. Opp'n to Pl. Mot. ("Defs. Opp'n")10, Docket Entry No. 72.)

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Twitty v. Salius*, 455 F. App'x 97, 99 (2d Cir. 2012) (quoting *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999)). "The spoliation of evidence germane 'to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction.'" *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 107 (2d Cir. 2001) (quoting *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998)). "In borderline cases, an inference of spoliation, in combination with 'some (not insubstantial) evidence' for the plaintiff's cause of action, can allow the plaintiff to survive summary judgment." *Wood v. Pittsford Cent. Sch. Dist.*, No. 07-CV-0892, 2008 WL 5120494, at *2 (2d Cir. Dec. 8, 2008) (quoting *Byrnie*, 243 F.3d at 107); *see Kronisch*, 150 F.3d at 128 ("We do not suggest that the destruction of evidence, standing alone, is enough to allow a party who has produced no evidence — or utterly inadequate evidence — in support of a given claim to survive summary judgment on that claim. But at the margin, where the innocent party has produced some (not insubstantial) evidence in support of his claim, the intentional destruction of relevant evidence by the opposing party may push a claim that might not otherwise survive summary judgment over the line.").

To succeed on a spoliation motion, the moving party must show: "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2)

that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Klipsch Grp., Inc. v. ePRO E-Commerce Ltd.*, 880 F.3d 620, 628 (2d Cir. 2018) (quoting *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 162 (2d Cir. 2012)).

"The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *In Re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 93, 148 (2d Cir. 2008) (quoting *Fujitsu Ltd. v. Fed. Exp. Corp.*, 247 F.3d 423, 436 (2d Cir. 2001)). "Once a court has concluded that a party was under an obligation to preserve the evidence that it destroyed, it must then consider whether the evidence was intentionally destroyed, and the likely contents of that evidence." *Klipsch Grp., Inc.*, 880 F.3d at 630 (quoting *Fujitsu Ltd.*, 247 F.3d at 436); *see also United States v. Barnes*, 411 F. App'x 365, 368 (2d Cir. 2011) (same). "The determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge, and is assessed on a case-by-case basis." *Klipsch Grp., Inc.*, 880 F.3d at 630 (citing *Fujitsu Ltd.*, 247 F.3d at 436); *see Mazzei v. Money Store*, 656 F. App'x 558, 559–60 (2d Cir. 2016) ("[A] district court may, at its discretion, grant an adverse inference jury instruction insofar as such a sanction would 'serve the threefold purpose of (1) deterring parties from destroying evidence: (2) placing the risk of an erroneous evaluation of the content of the destroyed evidence on the party responsible for its destruction: and (3) restoring the party harmed by the loss of evidence helpful to its case to where the party would have been in the absence of spoliation.'" (quoting *Byrnie*, 243 F.3d at 107)).

Plaintiff fails to show that Defendants had control over, or possession of, the photograph and therefore has not met his burden of proving spoliation.

Plaintiff argues that Defendants must have obtained the photograph, along with the other photographs that they preserved, after they questioned Deluca and took possession of her cellular telephone. (Pl. Mem. 15.) Deluca testified that she took at most two photographs during the May 2014 Incident including, (1) a photograph of the pick-up truck which the two perpetrators drove from the Curulli home,[15] and (2) a photograph of the backs of the two perpetrators. (Deluca Dep. 29–31.) Deluca showed the officers the photographs that she took on her cellular telephone, but she did not recall whether the officers made copies of the photographs. (Deluca Dep. 49:23–50:2, 54, 55.) Detective Danzinger testified that he was never shown or provided with any photograph of the perpetrators acting or committing the alleged burglary, (Danzinger Dep. 54:20), and, in a police report dated May 1, 2014, he noted that Deluca provided only photographs of the perpetrator's truck, (Complaint Follow-Up Form dated May 1, 2014).

Deluca's testimony that she took a blurry photograph of the perpetrator's backs with her cellular telephone and showed the officers the photographs is insufficient to prove that Detective Danzinger or Officer Donnelly ever had possession of or controlled the photograph of the perpetrators' backs, i.e., that they ever collected the evidence from Deluca. *See Creighton v. City of New York*, 12-CV-7454, 2017 WL 636415, at *18 (S.D.N.Y. Feb. 14, 2017) (denying the plaintiff's request for sanctions because the plaintiff could not prove that officers were ever in control of the allegedly spoliated evidence and "spoliation sanctions are not available where . . . a party merely fails to collect evidence"); *see also Sachs v. Cantwell*, 10-CV-1663, 2012 WL

---

[15] Deluca later clarified that she took two photographs of the perpetrator's truck. (Deluca Dep. 53.)

3822220, at *9 (S.D.N.Y. Sept. 4, 2012) (denying the plaintiff's motion for spoliation sanctions against the defendants although plaintiff alleged that the officers either intentionally or negligently violated their duty to view and/or to secure a security tape because "[s]poliation sanctions are applicable only when a party loses or destroys evidence, not when he or she fails to collect it." (citations omitted)).  Deluca did not recall whether the officers made copies of the photographs that were on her telephone, and Detective Danzinger testified that he never saw any photograph of the perpetrators, other than the wedding photograph of Plaintiff.  (Deluca Dep. 49:23– 50:2, 54, 55; Danzinger Dep. 54.)  Thus, there is no evidence in the record before the Court that the photograph of the back of the perpetrators was ever under Defendants' control.

Even assuming that Defendants did have control or possession of the photograph, Plaintiff fails to provide any evidence that Defendants intended to destroy the photograph, or that the photograph would have been relevant to Plaintiff's "claim[s] . . . such that a reasonable trier of fact could find that it would support [Plaintiff's] claim."  *Klipsch Grp., Inc.*, 880 F.3d at 628. Deluca testified that the photograph that she took of the perpetrators was of their backs and that she "took it real fast in motion, so it came out blurry."  (Deluca Dep. 30:11–21.)  In addition to taking the photograph of the perpetrators, Deluca viewed the perpetrators through the window, (Danzinger Dep. 55:1–5), and described one of the perpetrators as having "a very distinct beard that looked like Santa Claus," (Deluca Dep. 31:23–5).  Deluca subsequently identified Plaintiff from a photograph shown to her by Mrs. Curulli and identified Plaintiff from a line up.  (Tortora Dep. 65–66; Danzinger Dep. 112–114; Complaint Follow Up Informational Report; Lineup Administration Report.)

Plaintiff argues without any evidentiary support, that Defendants intentionally destroyed the photograph because they knew it would not implicate Plaintiff.  Such speculation (especially

where there is no evidence that the photograph was ever in Defendants' control) is insufficient to sustain his motion for sanctions.

Moreover, considering (1) the potential blurry quality of the photograph as testified to by Deluca, (2) the fact that the photograph only captured the backs of the two perpetrators, and (3) Deluca's firsthand account of the events, and although the photograph is relevant, Plaintiff has not shown that that the photograph would have supported his defense that he was not one of the two perpetrators observed at the scene of the May 2014 Incident. Accordingly, the Court denies Plaintiff's motion for sanctions for spoliation of evidence.[16]

### c. Excessive pre-arraignment detention claims

The parties cross-move for summary judgment as to Plaintiff's section 1983 claim for excessive pre-arraignment detention and state law claim for pre-arraignment delay.[17]

---

[16] Although the Court addressed the merits of Plaintiff's spoliation motion, the motion is untimely. As Defendants correctly argue, on May 25, 2017, Plaintiff filed a motion requesting that Magistrate Judge Vera M. Scanlon compel Defendants to produce the photograph of the perpetrator's backs. (Pl. Mot. to Compel, Docket Entry No. 41.) On September 14, 2017, Judge Scanlon denied the request and noted that Defendants' "counsel couldn't locate any photo of the back of the alleged perpetrators," (the "September 2017 Order"). (Order dated Sept. 14, 2017, Docket Entry No. 46.) Discovery concluded on December 13, 2017. (Order dated Dec. 13, 2017, Docket Entry No. 49.) Plaintiff did not file a motion for reconsideration of the September 2017 Order, appeal the September 2017 Order, or seek any other form of relief from Judge Scanlon or this Court until filing a letter on January 11, 2018 informing the Court of his intention to cross-move for summary judgment. (Pl. Letter dated Jan. 11, 2018, Docket Entry No. 50.) Plaintiff's request for discovery sanctions is therefore untimely. *Tri–Cty. Motors, Inc. v. Am. Suzuki Motor Corp.*, 494 F. Supp. 2d 161, 178 (E.D.N.Y. 2007) (finding a request for discovery sanctions untimely when made for the first time at summary judgment); *see also Baez v. Delta Airlines, Inc.*, No. 12-CV-3672, 2013 WL 5272935, at *9 n.15 (S.D.N.Y. Sept. 18, 2013) (collecting cases finding a motion for spoliation is untimely when issue was not raised during discovery).

[17] In the Amended Complaint filed on October 19, 2015, Plaintiff did not reallege his state law claims for denial of right to fair trial and excessive pre-arraignment detention, (Am. Compl., Docket Entry No. 12), but he did reallege these claims in his Second Amended Complaint, (SAC ¶¶ 70–73).

Plaintiff argues that he is entitled to summary judgment because Defendants failed to produce evidence of extraordinary circumstances justifying his forty-nine-hour pre-arraignment detention, and thus "Defendants have failed to meet their burden of explaining [Plaintiff's] delay in arraignment and there is no triable issue as to whether some extraordinary circumstance existed." (Pl. Mem. 11.) In addition, Plaintiff argues that Detective Danzinger "is responsible for this prolonged detention," because Plaintiff's arrest was his sole responsibility and it was his responsibility "to ensure that [Plaintiff was] brought before a Magistrate on a timely basis." (*Id.*)

Defendants argue that they are entitled to summary judgment as to these claims because "Plaintiff has wholly failed to establish that either Detective Danzinger or Detective Donnelly was personally involved in his purportedly excessive detention, or that they caused such detention," as required to prove his section 1983 claim. (Defs. Opp'n 6.) In addition, Defendants argue that because "[P]laintiff's arraignment occurred over the weekend, and [P]laintiff decided to waive his *Miranda* rights, answer questions, provide a written statement, and participate in a controlled call with non-party Vincent Curulli, [P]laintiff cannot establish that the 49-hour-8-minute-long detention constituted any unreasonable delay between his arrest and arraignment." (*Id.* at 7.)

### i. State law claim for pre-arraignment delay

Plaintiff's New York state law claim for pre-arraignment delay fails as a matter of law.

The Second Circuit has held that section 140.20 of the New York Criminal Procedure Law[18] does not provide a private right of action under which a plaintiff may sue. *See Walker v.*

---

[18] Section 140.20(1) of New York Criminal Procedure Law provides that:
Upon arresting a person without a warrant, a police officer, after performing without unnecessary delay all recording, fingerprinting and other preliminary police duties required in the particular case,

*City of New York*, 638 F. App'x 29, 33 (2d Cir. 2016) (stating that it is "well-settled Circuit

precedent . . . that § 140.20(1) does not create a private right of action." (quoting *Watson v. City

of New York*, 92 F.3d 31, 37 (2d. Cir. 1996))); *see also Watson*, 92 F.3d at 36-37 (holding that

there is not private right of action under N.Y. Crim. P. Law § 140.20); *Esperanza v. City of New

York*, 325 F. Supp. 3d 288, 305 (E.D.N.Y. 2018) (finding that a plaintiff's state law claims for

excessive pre-arraignment detention fail as a matter of law because "the Second Circuit has made

clear that N.Y. Crim. P. Law § 140.20 does not provide a private right of action under which

plaintiff may sue" (citing *Watson*, 92 F.3d at 36-37)); *Palacios v. City of New York*, No. 15-CV-

386, 2017 WL 4011349, at *10 (S.D.N.Y. Sept. 11, 2017) (same).  Thus, the Court grants

Defendants' motion for summary judgment as to Plaintiff's claim for excessive pre-arraignment

delay under New York law.

### ii. Section 1983 excessive pre-arraignment delay

As a general matter, "a presumption of reasonableness has long applied to pre-trial

detentions that last for fewer than 48 hours."  *Miller v. City of New York*, 700 F. App'x 57, 59

(2d Cir. 2017) (citing *Cty. of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991); *see Bryant v. City

of New York*, 404 F.3d 128, 138 (2d Cir. 2005) ("What is constitutionally required is that, except

in extraordinary circumstances, the arrestee be given a hearing into probable cause for the arrest

within 48 hours.").  In addition to demonstrating an unreasonable delay, a plaintiff must also

demonstrate (1) that the officer was personally involved in the constitutional deprivation and (2)

---

> must except as otherwise provided in this section, without
> unnecessary delay bring the arrested person or cause him to be
> brought before a local criminal court and file therewith an
> appropriate accusatory instrument charging him with the offense or
> offenses in question.

N.Y. Crim. P. Law § 140.20(1).

that the officer caused the deprivation. *See Walker v. City of New York*, No. 11-CV-00314, 2014 WL 12652345, at *6 (E.D.N.Y. Sept. 3, 2014), *aff'd*, 638 F. App'x 29 (2d Cir. 2016); *see also Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983," quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)). A plaintiff can show personal involvement through evidence demonstrating that "the defendant participated directly in the alleged constitutional violation." *Colon*, 58 F.3d at 873. For purposes of personal involvement, direct participation means "intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001). Indirect conduct "such as ordering or helping others to do the unlawful acts, rather than doing them oneself," may also constitute direct participation. *Id.* Personal involvement can also be shown by:

> evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference [. . . ] by failing to act on information indicating that unconstitutional acts were occurring.

*Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 127 (2d Cir. 2004) (citing *Colon*, 58 F.3d at 873). When the delay from arrest to arraignment exceeds forty-eight hours, "the arrested individual does not bear the burden of proving an unreasonable delay. Rather, the burden shifts to the [defendant] to demonstrate the existence of a bona fide emergency or other extraordinary circumstance." *Cty. of Riverside*, 500 U.S. at 57.

Both parties concede that Plaintiff was detained for approximately forty-nine hours and

eight minutes before his arraignment.  (Pl. 56.1 ¶ 16; Defs. Resp. ¶ 16.)

### 1. Claim against Officer Donnelly

Plaintiff argues that Detective Danzinger is "solely" responsible for his detention.  (Pl. Mem. 12.)  As a result of Plaintiff's argument that Detective Danzinger is solely responsible for his detention, his excessive pre-arraignment against Officer Donnelly fails as a matter of law. *See Walker*, 2014 WL 12652345, at *6.  Therefore, the Court grants Defendants' motion for summary judgement as to Officer Donnelly on this claim.

### 2. Claim against Detective Danzinger

Plaintiff contends that Detective Danzinger was personally involved in his excessive pre-arraignment detention because the "arrest was by all account[s] [Detective] Danzinger's sole responsibility," and "the decision to arrest [Plaintiff] was his and his alone."  (Pl. Mem. 12.)  In support of his contention, Plaintiff argues that "Danzinger testified that he spent several hours with [P]laintiff during the course of the arrest including," (1) having discussions with Plaintiff at the Precinct, (2) transporting Plaintiff to the District Attorney's office in Staten Island for a controlled call, (3) placing Plaintiff in a lineup at the Precinct on the evening of Plaintiff's arrest, and (4) signing the criminal court complaint.  (Pl. Reply in Supp. of Pl. Mot. ("Pl. Reply") 5, Docket Entry No. 70.)

Defendants argue that they are entitled to summary judgment as to Plaintiff's excessive pre-arraignment claim against Detective Danzinger because "the record is devoid of any evidence that Detective Danzinger was personally involved in any delay by either exercising control over the length of [P]laintiff's detention or engaging in any unnecessary conduct that contributed to delaying the criminal court's probable cause determination."  (Defs. Mem. 19.) Defendants concede that Detective Danzinger spoke with Plaintiff to obtain additional

information, transported him to the District Attorney's office, and assisted in conducting a lineup, but argue that Plaintiff "simply has provided no information to suggest that any of Detective Danzinger's actions were taken to unnecessarily delay his arraignment." (*Id.*)

There is no evidence in the record to support Plaintiff's claim that Detective Danzinger either directly or indirectly exercised control over the length of Plaintiff's detention or engaged in any conduct that contributed to delaying Plaintiff's arraignment, other than his interactions with Plaintiff on day of Plaintiff's arrest, including obtaining additional information from Plaintiff, transporting him to the District Attorney's Office to place a monitored call to Mr. Curulli, and assisting with the line-up. The fact that Danzinger arrested Plaintiff and signed Plaintiff's criminal complaint does not provide sufficient evidence to support Plaintiff's claim that Detective Danzinger was personally involved in the delay of his arraignment. *See Walker*, 2014 WL 12652345, at *6 ("Cases finding that an individual officer was involved in an excessive detention have required more extensive involvement than arresting the detainee and signing the criminal complaint."); *see also Jones v. King*, No. 10-CV-0897, 2011 WL 4484360, at *7 (S.D.N.Y. Sept 28, 2011) (dismissing a plaintiff's claim of excessive pre-arraignment detention against arresting officers in part because the plaintiff failed to allege facts supporting defendants' personal involvement in plaintiff's delayed arraignment). According to Danzinger's testimony, he did not transfer Plaintiff to central booking, did not know when Plaintiff was arraigned, and does not believe he saw Plaintiff after the night of Plaintiff's arrest. (Danzinger Dep. 98, 99.) He also testified that he "did not discuss with anybody when [Plaintiff] should be brought to central booking . . . ." (Danzinger Dep. 95:22–96:23.) Plaintiff has not presented any evidence to the contrary.

In addition, the fact that Detective Danzinger was Plaintiff's arresting officer and was required by New York City Criminal Procedure Law to promptly take Plaintiff to court does not negate Plaintiff's responsibility to prove Detective Danzinger's personal involvement. Citing New York Criminal Procedure Law section 140.20, Plaintiff argues that "by statute, the arresting officer . . . is responsible to ensure that an arrestee is brought before a Magistrate on a timely basis." (Pl. Mem. 12 (citing N.Y. Crim. P. Law § 140.20).) New York Criminal Procedural Law § 140.20(1) provides:

> Upon arresting a person without a warrant, a police officer, after performing without unnecessary delay all recording, fingerprinting and other preliminary police duties required in the particular case, must except as otherwise provided in this section, without unnecessary delay bring the arrested person or cause him to be brought before a local criminal court and file therewith an appropriate accusatory instrument charging him with the offense or offenses in question.

N.Y. Crim. P. Law § 140.20(1). However, the Second Circuit has held that section 140.20(1) of the New York Criminal Procedure Law does not alter the requirement that a plaintiff prove personal involvement in section 1983 claims. *See Bernshtein v. City of New York*, 496 Fed. App'x. 140, 143 (2d Cir. 2012) (holding that even if the defendant had a duty as the arresting officer to "assure the [plaintiff's] arraignment without unnecessary delay," the district court did not err in instructing the jury that the defendant could not be liable under § 1983 unless defendant was the proximate cause of the plaintiff's unreasonable delay). Thus, the fact that Detective Danzinger arrested Plaintiff is not sufficient evidence to prove his personal involvement in Plaintiff's excessive pre-arraignment delay.

Moreover, Plaintiff fails to show that Detective Danzinger's conduct was outside of ordinary police procedure or that he prolonged the period between Plaintiff's arrest and arraignment for improper or unlawful reasons. After Detective Danzinger arrested Plaintiff and

Plaintiff told Detective Danzinger that he was out of town during the May 2014 Incident, Detective Danzinger gave Plaintiff "the benefit of the doubt," and called the hotel in Maryland to corroborate Plaintiff's alibi. (Danzinger Dep. 136–40.). He also organized the call to determine whether or not the property that was allegedly stolen was "taken by someone else," (Danzinger Dep. 104: 3–10), and arranged the call at the Staten Island District Attorney's squad because the Precinct did not have the "facility" for Plaintiff to conduct the call, (Danzinger Dep. 104:15–18). Further, Detective Danziger also had Deluca come to the Precinct to view a lineup which included Plaintiff. (Tortora Dep. 65:1–5; Danzinger Dep. 112–114, 117.) In addition, Detective Danzinger met with the District Attorney to sign the criminal court complaint early in the morning on May 3, 2014 (outside of the presence of Plaintiff), less than forty-eight hours after Plaintiff's arrest. (Danzinger Dep. 132:19–22.) These actions are within ordinary police procedures and Plaintiff has not shown otherwise. *See Walker*, 2014 WL 12652345, at *6 ("[A]n individual officer can be found liable for unreasonable detention where testimony supported concluding that the officer 'exert[ed] control over' the detention, and either engaged in conduct that unnecessarily delayed the detainee's arraignment for reasons not reasonably justified by the needs of ordinary police procedure or delayed the detention out of ill will." (citing *Gonzalez v. Bratton*, 147 F. Supp. 2d 180, 199-201 (S.D.N.Y. 2001))).

Absent evidence that Detective Danzinger personally prolonged the period between Plaintiff's arrest and arraignment for reasons "not reasonably justified by the needs of ordinary police procedure," Detective Danzinger cannot be held liable under section 1983 for excessive pre-arraignment detention. *See Walker*, 638 F. App'x at 33 (affirming the district court's finding of no personal involvement on behalf of the defendants where plaintiff was arraigned for approximately forty-nine hours).

Accordingly, the Court grants Defendants' motion for summary judgment as to Plaintiff's excessive pre-arraignment claims against Detective Danzinger.

### d. Section 1983 failure to intervene claim against Officer Donnelly as to Plaintiff's excessive pre-arraignment claim

Plaintiff argues that Officer Donnelly's December 2014 Facebook Post in which he told Mrs. Curulli "that . . . an arrestee that came to the precinct . . . used Mr. Curulli's name . . . and [Officer] Donnelly responded with . . . vulgar language regarding the arrestee not being able to see a judge for three days," "suggests that Officer Donnelly was aware of the extraordinarily long detention of . . . Plaintiff and yet took no action to avoid this well[-]established constitutional violation." (Pl. Opp'n 14–15.) Plaintiff also argues that while Officer Donnelly "denies that he was referring to Plaintiff, he . . . could not identify at his deposition, who he was speaking about." (*Id.*) Based on these facts, Plaintiff argues that "an issue of fact exists as to whether or not [Officer] Donnelly was referring to Plaintiff and had some influence as to when and how Plaintiff would be arraigned." (Pl. Opp'n 15.)

Defendant argues that "there is nothing in the record to support [P]laintiff's claim that [D]efendants failed to intervene in any violation of [P]laintiff's constitutional rights," as Officer Donnelly "had no involvement in [P]laintiff's arrest or prosecution . . . ." (Defs. Mem. 22.) In addition, Defendants argue that "there can be no failure to intervene, where there was no constitutional violation," and as such, Plaintiff's failure to intervene claim must be dismissed. (*Id.*)

"[L]aw enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Terebesi v. Torreso*, 764 F.3d 217, 243 (2d Cir. 2014) (quoting *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir. 1994) (collecting cases)). An officer may be liable for the preventable

harm caused by the officer's failure to intervene during a constitutional violation where the officer "observes the [constitutional violation] and has sufficient time to act to prevent it." *Figueroa v. Mazza*, 825 F.3d 89, 106 (2d Cir. 2016) (citation omitted); *see also Terebesi*, 764 F.3d at 244. However, "[a]n underlying constitutional violation is an essential element of a failure to intercede claim under [section] 1983." *Henry-Lee v. City of New York*, 746 F. Supp. 2d 546, 566 (S.D.N.Y. 2010) (citing *Ricciuti*, 124 F.3d at 129); *see also Wieder v. City of New York*, 569 F. App'x 28, 30 (2d Cir. 2014) ("Because the underlying constitutional claims were properly dismissed, we also affirm the district court's dismissal of plaintiff's failure to intervene claim."); *Levy v. City of New York*, 935 F. Supp. 2d 575, 594 (E.D.N.Y. 2013) ("[T]he failure to intervene claim is contingent upon the disposition of the primary claims underlying [it]." (quoting *Matthews v. City of New York*, 889 F. Supp. 2d 418, 443–44 (E.D.N.Y. 2012))).

When asked about Officer Donnelly at his deposition, Plaintiff testified that he had one encounter with Officer Donnelly at the Precinct and none at the 123rd Precinct. (Tortora Dep. 77.) Plaintiff did not testify that he had any conversation with Officer Donnelly about Mr. Curulli, nor did he testify that Officer Donnelly threatened to delay his arraignment.[19] (Tortora Dep. 77.) Plaintiff testified that his only interaction with Officer Donnelly transpired when Officer Donnelly, while on the telephone, turned to Plaintiff to ask him if his name was Paul. (*Id.*) Plaintiff has adduced no evidence to support his claim that Officer Donnelly should have

---

[19] Plaintiff testified that while he was under arrest at the Precinct, Officer Donnelly, while on the telephone, turned to Plaintiff to ask him if his name was Paul. (Tortora Dep. 77.) When Plaintiff said no, Officer Donnelly hung up the telephone. (*Id.*) Plaintiff testified that his friend, Neil Garone, later informed Plaintiff that an attorney had called asking if Plaintiff was at the Precinct. (*Id.*) Plaintiff believes that the attorney was on the telephone when Officer Donnelly inquired about his name. (*Id.* at 77, 78.) Plaintiff did not have any further encounters with Officer Donnelly.

been aware of his detainment, either at the time of his arrest or anytime thereafter.  *See Figueroa v. Mazza*, 825 F.3d 89, 106 (2d Cir. 2016) ("An officer may be liable for the preventable harm caused by the officer's failure to intervene during a constitutional violation where the officer "observes the [constitutional violation] and has sufficient time to act to prevent it.").

Plaintiff relies on the December 2014 Facebook Post to support his claim that "a jury is needed . . . to determine whether . . . Donnelly had the ability to insure that Plaintiff was timely arraigned."  (Pl. Opp'n 15.)  However, Plaintiff fails to present evidence to support his claim that Officer Donnelly was referring to Plaintiff in the 2014 Facebook Post.  In the December 2014 Facebook Post to Mrs. Curulli, Officer Donnelly made reference to an individual who was in custody in Staten Island and indicated that he told this individual "you won't see the f****** judge for a couple of days," when the individual sought to use Mr. Curulli's name to get an early release.  (Donnelly Facebook Post dated December 19, 2014.)  During his deposition, Officer Donnelly testified that his comment was made in reference to a perpetrator that was under arrest at the 123rd Precinct.  (Donnelly Dep. 51:20–52:2.)  Moreover, when asked about Officer Donnelly during his deposition, Plaintiff testified that he encountered Officer Donnelly at the Precinct and Officer Donnelly, while on the telephone, turned to ask him if his name was Paul.  (Tortora Dep. 77.)  He did not testify that he had any conversation with Officer Donnelly about Mr. Curulli or that he attempted to use Mr. Curulli's name to gain early release.  (Tortora Dep. 77.)  Further, in Plaintiff's moving papers, he does not assert that he had any encounter with Officer Donnelly in which Officer Donnelly threatened to delay his arraignment.

Regardless, because Plaintiff has failed to provide sufficient evidence to support his underlying constitutional claim of excessive pre-arraignment delay, Plaintiff's failure to intervene claim also fails.  *See Coleman v. City of New York,* No. 07-CV-1051, 2010 WL

571986, at *5 (S.D.N.Y. Feb. 2, 2010) (dismissing failure to intervene claims against police officers where no underlying constitutional violation was alleged). The Court therefore grants Defendants' motion for summary judgment as to Plaintiff's failure to intervene claim.

### e. Section 1983 false arrest claims

Defendants move for summary judgment as to Plaintiff's claim that he was falsely arrested on May 2, 2014.[20] (Defs. Mem. 6.) Plaintiff was arrested at the Precinct, on charges of burglary in the third degree, criminal trespass in the third degree, petit larceny, and criminal possession of stolen property in the fifth degree. (*Id.* at 7.)

In addressing a section 1983 claim for false arrest, courts look to "the law of the state in which the arrest occurred" to determine if the officers had probable cause to arrest the plaintiff for a violation of state law. *Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir. 2006); *see also Ackerson v. City of White Plains*, 702 F.3d 15, 19–21 (2d Cir. 2012) (analyzing whether the plaintiff's actions gave a police officer probable cause to arrest the plaintiff for violating state law). To establish a section 1983 claim for false arrest under New York law, the plaintiff must adduce evidence that (1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged. *Berg v. Kelly*, 897 F.3d 99, 106 (2d Cir. 2018) (citing *Jocks v. Tavernier*, 316 F.3d 128, 135 (2d Cir. 2003)). Under section 1983, individuals may bring a private cause of action against persons "acting under color of state law" to recover money

---

[20] Plaintiff does not provide any evidence to suggest that Officer Donnelly was personally involved in his arrest or any of the subsequent proceedings. Accordingly, the Court grants Defendants' motion for summary judgment as to Plaintiff's section 1983 claims against Officer Donnelly. *See Farid v. Ellen*, 593 F.3d 233, 249 (2d Cir. 2010) ("It is well-established in the Second Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under §1983." (quoting *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006))).

damages for deprivations of their federal or constitutional rights. *Matusick v. Erie Cty. Water Auth.*, 757 F.3d 31, 55 (2d Cir. 2014) (quoting 42 U.S.C. § 1983). To establish a viable section 1983 claim, a plaintiff must show "the violation of a right secured by the Constitution and laws of the United States" and that "the alleged deprivation was committed by a person acting under color of state law." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87–88 (2d Cir. 2015) (citations and internal quotation marks omitted).

The Fourth Amendment protects individuals from unreasonable searches and seizures by law enforcement officials. *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). A law enforcement official violates the Fourth Amendment's protections if he or she arrests someone without probable cause. *Id.* Conversely, "probable cause is an absolute defense to a false arrest claim." *Stansbury v. Wertman*, 721 F.3d 84, 89 (2d Cir. 2013) (quoting *Torraco v. Port Auth. of N.Y. & N.J.*, 615 F.3d 129, 139 (2d Cir. 2010)). "A police officer has probable cause for an arrest when he has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime . . . .'" *Swartz v. Insogna*, 704 F.3d 105, 111 (2d Cir. 2013) (quoting *Weyant*, 101 F.3d at 852); *see also Gonzalez*, 728 F.3d at 155. In addition, police officers have probable cause to arrest when they personally observe a person commit a crime in their presence. *See Ackerson*, 702 F.3d at 20; *United States v. Scopo*, 19 F.3d 777, 781–82 (2d Cir. 1994). The reviewing court "must consider [only] those facts available to the officer at the time of the arrest and immediately before it." *Stansbury*, 721 F.3d at 89 (alteration in original) (quoting *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006)). Probable cause need not be "predicated upon the offense invoked by the arresting officer, or even upon an offense 'closely related' to the offense invoked by the arresting officer." *Jaegly*, 439 F.3d at 153

(quoting *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)). A "plaintiff is not entitled to damages under [section] 1983 for false arrest so long as the arrest itself was supported by probable cause, regardless of whether probable cause supported any individual charge identified by the arresting officer at the time of arrest." *Id*. at 154. The question is whether the facts known to the arresting officer, at the time of the arrest, objectively support a finding of probable cause to support the arrest. *Gonzalez*, 728 F.3d at 155.

Defendants argue that Plaintiff's arrest was privileged because "there was probable cause to arrest [P]laintiff for Burglary in the Third Degree under Section 140.20 of the New York Penal Law ("N.Y.P.L."), Criminal Trespass in the Third Degree (N.Y.P.L. § 140.10(a)), Petit Larceny (N.Y.P.L. § 155.25), and Criminal Possession of Stolen Property in the Fifth Degree (N.Y.P.L. § 165.40), and, thus, [Plaintiff's] federal . . . false arrest claim fails as a matter of law." (Defs. Mem. 7.) In addition, Defendants also argue in their reply that Plaintiff has failed to set forth any "credible evidence that properly rebuts," the facts laid out by Defendants "that provide the basis for Detective Danzinger's reasonable belief that [P]laintiff had committed a crime." (Defs. Reply 2.)

Plaintiff argues that: (1) his arrest was void *ab initio* because he was excessively detained prior to his arraignment, (2) there is an issue of fact as to whether probable cause existed because it is disputed whether Detective Danzinger viewed and discarded photographs taken by Deluca of the perpetrators who entered the Property, and (3) probable cause vitiated during Plaintiff's time in custody after Detective Danzinger became aware that Plaintiff was in Maryland. (Pl. Opp'n 3–7.)

i. **Plaintiff's arrest is not *void ab initio* because he has not proven that he was subject to excessive pre-arraignment detention under section 1983**

Plaintiff argues that his arrest should be deemed *void ab initio* because he was excessively detained prior to his arraignment. (Pl. Opp'n 7.)

"An arrest, lawful in its inception, may nevertheless be rendered void *ab initio* for purposes of a false imprisonment action if there is an unnecessary delay in arraignment." *Watson*, 92 F.3d at 35–36 (citing *Lewis v. Counts*, 438 N.Y.S.2d 863, 864 (2d Dep't 1981)).

As discussed *supra*, Plaintiff has failed to prove the personal involvement of Defendants in his excessive pre-arraignment detention claim, thus his arrest cannot be deemed *void ab initio*.

ii. **Detective Danzinger had probable cause to arrest Plaintiff for burglary in the third degree**

Defendants argue that Detective Danzinger had probable cause to arrest Plaintiff for burglary in the third degree because (1) Mrs. Curulli reported to the NYPD that someone broke into the shed at her home and removed property that belonged to her, and (2) Deluca, an eyewitness to the May 2014 Incident, identified Plaintiff in a photograph from Mrs. Curulli's wedding album and from a lineup at the Precinct. (Defs. Mem. 8.)

Section 140.20 of the New York Penal Law provides that "[a] person is guilty of burglary in the third degree when he knowingly enters or remains unlawfully in a building with intent to commit a crime therein." N.Y. Penal Law § 140.20. A building in the context of section 140.20 of the New York Penal Law includes structures other than dwellings. *See United States v. Brown*, 514 F.3d 256, 265 (2d Cir. 2008) (stating that under section 140.20 of the New York Penal Law "buildings include structures other than dwellings"); *see also Hernandez v. United States*, No. 10-CR-281, 2017 WL 2389600, at *4 (E.D.N.Y. June 1, 2017) ("With respect to criminal trespass and burglary, New York State defines 'building' as, *inter alia*: in addition to its

ordinary meaning, includ[ing] any structure, vehicle or watercraft used for overnight lodging of persons, or used by persons for carrying on business therein, or used as an elementary or secondary school, or an inclosed [sic] motor truck, or an inclosed [sic] motor truck trailer." (citing N.Y. Penal Law § 140.00(2))).

It is well-established that a law enforcement officer has "probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness, who it seems reasonable to believe is telling the truth." *Martinez v. Simonetti,* 202 F.3d 625, 634 (2d Cir. 2000); *see also Williams v. City of New York*, 683 F. App'x 57, 59 (2d Cir. 2017) (holding that "the circumstances known to the arresting officers in each of the three arrests did not 'raise doubts as to [the victim's] veracity' such that the officers were unjustified in relying on [the victim's] accusations" as the basis for probable cause (quoting *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995)); *Fabrikant v. French*, 691 F.3d 193, 216 (2d Cir. 2012) ("A law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness, unless the circumstances raise doubt as to the person's veracity." (alterations and citations omitted)); *Singer*, 63 F.3d at 119 ("An arresting officer advised of a crime by a person who claims to be the victim, and who has signed a complaint or information charging someone with the crime, has probable cause to effect an arrest absent circumstances that raise doubts as to the victim's veracity.").

Identification of a suspect in a lineup is sufficient to establish probable cause provided the circumstances do not cast doubt on the reliability of the identification. *See Keith* v. *City of N.Y.*, 641 F. App'x 63, 67 (2d Cir. 2016) (finding probable cause where victim positively identified suspect after seeing him in neighborhood and again during lineup, and noting, "information from an identified citizen accusing another individual of the commission of a

specific crime is [generally still] sufficient to provide the police with probable cause" (quoting *Okunubi* v. *City of New York*, 971 N.Y.S.2d 338, 340 (App. Div. 2013)); *see also Nunez v. City of New York*, 735 F. App'x 756, 761 (2d Cir. 2018) (noting that a "law enforcement officer generally has probable cause to arrest based on information received from putative victim or eyewitness unless circumstances raise doubt as to the person's veracity" (internal quotation marks omitted) (citing *Fabrikant* , 691 F.3d at 216)); *Jones v. Meehan*, No. 14-CV-6402, 2018 WL 459662, at *12 (S.D.N.Y. Jan. 16, 2018) ("Indeed, the positive identification by a victim during a lineup alone would have sufficed to establish probable cause."); *Harrison v. Cty. of Nassau*, No. 15-CV-2712, 2018 WL 5093257, at *10 (E.D.N.Y. Aug. 31, 2018) ("A positive photo identification by an eyewitness is normally sufficient to establish probable cause to arrest." (quoting *Celestin v. City of New York*, 581 F. Supp. 2d 420, 431 (E.D.N.Y. 2008))).  In contrast to the more demanding standard of whether evidence of an identification lacks "indicia of reliability" employed to determine the admissibility of an identification in a criminal trial, for "the purposes of determining whether an identification can support probable cause, the basic question is whether the identification procedure was 'so defective that probable cause could not reasonably be based upon it.'"  *Stansbury*, 721 F.3d at 91 n.7 (quoting *Jenkins v. City of New York*, 478 F.3d 76, 93 (2d Cir. 2007)).

The undisputed facts and sworn deposition testimony from Deluca and Detective Danzinger establish that Detective Danzinger had probable cause to arrest Plaintiff.  The parties agree that on May 1, 2014, Deluca saw two individuals enter the yard of the Curulli home, and walk towards the backyard, and subsequently enter the shed.  (Defs. 56.1 ¶¶ 2–3.)  Detective Danzinger testified that the "precinct detective squad received a phone call of a burglary at [the Curulli home]," on May 1, 2014.  (Danzinger Dep. 33:21–35: 25.)  When Detective Danzinger

arrived, Mrs. Curulli informed him that the perpetrators had broken into the shed, (Defs. 56.1 ¶12), and had taken a silver boat engine and a black and red generator, (Police Follow-up Informational Report dated May 1, 2014).  The officers conducted a search of the shed and observed that the boat engine and generator were missing.  (Police Follow-up Informational report dated May 1, 2014.) Mrs. Curulli also told Detective Danzinger that the stolen property belonged to her.[21]  (Danzinger Dep. 63:24–64:4.)

In addition, Deluca told the officers that she had observed the men through the window, and that she saw the face of one of the perpetrators.  (Danziger Dep. 50:18–20, 55:1–5; Deluca Dep. 49.)  She also told the officers that one man had a beard, (Deluca Dep. 58), and she signed a photograph of Plaintiff from Mrs. Curulli's wedding album and identified him as the "person [she] saw standing outside in the backyard in the shed . . . . "  (Deluca Dep. 108.)  On May 2, 2014, Deluca also identified Plaintiff in a lineup at the Precinct.  (Deluca Dep.117; Tortora Dep. 65–66; Complaint Follow Up Informational Report; Lineup Administration Report.)

Based on these facts, no reasonable jury could find that Detective Danzinger lacked probable cause to arrest Plaintiff for burglary in the third degree.

Plaintiff makes several arguments in his attempt to challenge probable cause, none of which are persuasive.  First, Plaintiff argues that the "blurry" photograph Deluca took of the perpetrators' "backs" could have potentially dissipated probable cause; however, Deluca's eyewitness testimony and identification of Plaintiff during a lineup provided enough evidence to

---

[21]  Plaintiff disputes that Mrs. Curulli told Detective Danzinger that the stolen items belonged to her and notes that Rhiannon La Toure, the Assistant District Attorney, testified that she received information from Ms. Curulli that the stolen property belonged to Mr. Curulli.  (R. La Tour Dep. 28; Pl. Resp. to Defs. 56.1 ¶ 16.)  However, even if true, it does not contradict Detective Danzinger's testimony that while at the scene, Mrs. Curulli told him that the property belonged to her.

establish probable cause.  Although the potential exculpatory value of the photograph is disputed by the parties, once Deluca shared that she saw the face of one of the perpetrators at the scene and signed a photograph of Plaintiff from Mrs. Curulli's wedding album, stating that he was "standing outside in the backyard in the shed," Detective Danzinger had no reason to rely on a blurry photograph of the perpetrators' backs captured by the same eyewitness.  *See Dunkelberger v. Dunkelberger*, No. 14-CV-3877, 2015 WL 5730605, at *9 (S.D.N.Y. Sept. 30, 2015) ("Courts have . . . held that identification by an eyewitness alone can suffice to establish probable cause, in the absence of any reason to believe that person is not telling the truth.").

Second, Plaintiff also argues that Defendants lacked probable cause to arrest him because Deluca initially identified a filler at her deposition as the individual she saw in the back yard, and therefore could not have identified him during the lineup.  (Pl. Opp'n 6.)  However, Deluca acknowledged during her deposition testimony that she was mistaken when she identified someone other than Plaintiff, and she later corrected her testimony and identified Plaintiff as the individual whom she selected from the lineup on May 2, 2014.  (Deluca Dep. 113.)  Moreover, in assessing probable cause the Court must only consider the facts available to Detective Danzinger at the time of the arrest, thus Deluca's mistake at a deposition that occurred three years after the May 2014 Incident is not relevant to the Court's determination of whether Detective Danzinger had probable cause to arrest Plaintiff.  *See Stansbury*, 721 F.3d at 89.

Third, Plaintiff appears to also challenge, without any evidence, the veracity of Deluca's identification of Plaintiff based on the photograph from Mrs. Curulli's wedding album by asserting that Mrs. Curulli showed Deluca the photograph in a suggestive manner.  (Pl. Opp'n 3.) Plaintiff offers no evidence to support this argument.

Lastly, Plaintiff makes references to the Curulli's "tumultuous divorce proceedings," and

Mrs. Curulli's history as a police officer in Staten Island and suggests that (1) Detective

Danzinger's knowledge of Mr. and Mrs. Curulli's divorce proceedings and his relationship with

Mrs. Curulli somehow undermines probable cause, and (2) Detective Danzinger should have

doubted Deluca's credibility given his knowledge of the Mr. and Mrs. Curulli's pending divorce.

(*Id.*)  The Court finds these arguments unpersuasive.  Detective Danzinger's alleged personal

relationship with Mrs. Curulli is irrelevant to the Court's probable cause analysis because

"probable cause is an objective matter that does not depend on the subjective biases of the

arresting officer."  *Simmons v. N.Y.C. Police Dep't*, 97 F. App'x 341, 343 (2d Cir. 2004) (citing

*Whren v. United States*, 517 U.S. 806, 812–13 (1996)); *see also Lanning v. City of Glens Falls*,

No. 16-CV-00132, 2017 WL 922058, at *3 (N.D.N.Y. Mar. 8, 2017) ("Even if there is a question

of a defendant's motivation, motivation is not a consideration in a court's objective assessment

of probable cause." (alterations, citations, and internal quotation marks omitted)).  In addition,

police officers are permitted to rely on eyewitness testimony even in the context of marital

disputes.  *See Weiner v. McKeefery*, 90 F. Supp. 3d 17, 30–31(2015) ("[T]he fact that a victim

may be entangled in a domestic dispute does not, in and of itself, undermine the victim's

veracity."); *Rheingold v. Harrison Town Police Dep't*, 568 F. Supp. 2d 384, 390 (S.D.N.Y.

2008) (stating that the arresting officer "could rely on [the alleged perpetrator's ex-wife's]

complaint because he had no reason at the time to doubt the veracity of her statement").

Plaintiff has not pointed to any probative evidence to suggest that Detective Danzinger

had knowledge of any circumstances that could raise doubts about the veracity of Deluca's

eyewitness identification, nor has he advanced any other evidence to undermine the credibility of

Deluca's eyewitness account.  Thus, Deluca's eyewitness identification of Plaintiff supports

probable cause for Plaintiff's arrest.  *See Williams*, 2016 WL 3194369, at *6 ("Given the absence

of 'circumstances that would raise doubt' as to the veracity of [an eyewitness's] identification of [plaintiff], the rule that eyewitness identification' is typically sufficient to provide probable cause' controls this case.").

### iii. Probable cause did not dissipate during the course of Plaintiff's arrest

Plaintiff also argues that even if probable cause arose during the course of his arrest, probable cause "dissipated" because (1) Plaintiff informed Detective Danzinger that he "could not have committed [the] alleged crime as he was in Maryland on a golf trip with several friends at the time of the alleged crime," and (2) Keane, a retired NYPD Detective, told Detective Danzinger that he was with Plaintiff in Maryland at the time of the incident. (Pl. Opp'n 4.)

"It is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness, and an officer's failure to investigate an arrestee's protestations of innocence generally does not vitiate probable cause." *Tuccillo v. Cty. of Nassau*, 723 F. App'x 81, 82 (2d Cir. 2018) (internal quotation marks omitted) (citing *Panetta*, 460 F.3d at 395–96); *Panetta*, 460 F.3d at 395–96 ("[A]n officer's failure to investigate an arrestee's protestations of innocence generally does not vitiate probable cause."). "Once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Locovello v. City of New York*, 701 F. App'x 71, 73 (2d Cir. 2017) (quoting *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997)); *see also D'Alessandro v. City of New York*, 713 F. App'x 1, 10 (2d Cir. 2017) (finding that arresting officer was under no obligation to determine the defendant's guilt conclusively before arresting him) (citing *Panetta*, 460 F.3d at 396); *Russell v. The Journal News*, 672 F. App'x 76, 81 (2d Cir. 2016) ("the factfinder determines whether a defendant's story holds up, not the arresting

officer."); *Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) ("Although a better procedure may have been for the officers to investigate plaintiff's version of events more completely, the arresting officer does not have to prove plaintiff's version wrong before arresting him.").

Although Plaintiff informed Detective Danzinger that he was in Maryland at the time of the arrest, Plaintiff admitted at his deposition that he did not have any physical proof to support his claim, (Tortora Dep. 53), thus, Plaintiff's account of his whereabouts did not negate probable cause. *See Qing You Li v. City of New York*, No. 16-CV-174, 2018 WL 6251339, at *5 (E.D.N.Y. Nov. 28, 2018) (stating that although the plaintiff professed his innocence "the officers were not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest," quoting *Curley*, 268 F.3d at 70).

Detective Danzinger was also under no obligation to investigate or rely upon Keane's assertion that he was with Plaintiff in Maryland at the time of the May 2014 Incident, especially in view of the fact that Keane did not have any evidence to support his claim. *See Nelson v. Hernandez*, 524 F. Supp. 2d 212, 224 (E.D.N.Y. 2007) (finding the plaintiff's claim that probable cause dissipated "meritless because the police have no obligation to investigate a defendant's alibi and any failure to do so would not have vitiated the existence of probable cause" (citations and internal quotation marks omitted)); *see also Celestin*, 581 F. Supp. 2d at 432 (finding that a detective "was not required to investigate [the plaintiff's] alibi or exhaustively search for other suspects before acting on the facts at hand because once the evidence establishe[d] probable cause, an officer is not required to continue investigating, sifting and weighing information, nor is an officer obligated to investigate the suspect's plausible claims of

innocence"). Moreover, Detective Danzinger attempted without success to verify Plaintiff's alibi by calling the hotel where Plaintiff said he stayed.

Because Detective Danzinger had probable cause to arrest Plaintiff for burglary in the third degree, the Court grants Defendants' motion for summary judgment as to Plaintiff's section 1983 false arrest claim.[22]

---

[22] Detective Danzinger also had probable cause to arrest Plaintiff for petit larceny, criminal possession of stolen property in the fourth and fifth degrees, and criminal trespass in the third degree. Under section 155.25 of the New York Penal Law, a person is guilty of petit larceny when: "he steals property." N.Y.P.L. § 155.25. Detective Danzinger had probable cause to arrest Plaintiff for petit larceny because Mrs. Curulli informed him that Plaintiff and another perpetrator had broken into the shed, (Defs. 56.1 ¶12), and drove away with a silver boat engine, (Police Follow-up Informational dated May 1, 2014). In addition, the officers conducted a search of the shed and observed that a silver boat engine and a black and red generator were missing. (Police Follow-up Informational report dated May 1, 2014.) *See Kampfer v. Pitcher,* No. 95–CV–214, 1996 WL 31161 at *5 (N.D.N.Y. Jan. 19, 1996) (finding probable cause for petit larceny where officer had statements and documentary evidence from the victims, in addition to evidence substantiating the victims' claims), *aff'd* 112 F.3d 504 (2d Cir. 1997).

These facts also support probable cause to arrest Plaintiff for criminal possession of stolen property in the fourth degree and fifth degree under sections 165.45 and 165.40 of the New York Penal Code. A person is guilty of criminal possession of stolen property in the fifth degree when "he knowingly possesses stolen property with the intent to benefit himself or a person other than an owner thereof or to impede the recovery by an owner thereof," irrespective of the nature or value of the property. N.Y.P.L. § 165.40. A person is guilty of criminal possession of stolen property in the fourth degree when "he knowingly possesses stolen property with the intent to benefit himself or a person other than an owner thereof or to impede the recovery by an owner thereof, and when . . . the value of the property exceeds one thousand dollars." N.Y.P.L. § 165.45(1). The term "owner" is defined under section 155.00(5) of the New York Penal Code as "any person who has a right to possession thereof superior to that of the taker, obtainer or withholder." N.Y.P.L. § 155.00(5). The boat motor and generator were located in a shed at the back of the Curulli home where Mrs. Curulli lived. (Police Follow-up Informational report dated May 1, 2014.) Thus, Mrs. Curulli had a right of possession superior to that of Plaintiff. Further, during Detective Danzinger's investigation on May 1, 2014, Mrs. Curulli informed Detective that the boat motor and the generator belonged to her, (Danzinger Dep. 63:24–64:4), therefore it was reasonable for Detective Danzinger to believe that Plaintiff had criminally possessed stolen property belonging to Mrs. Curulli. *Fiedler v. Incandela*, 222 F. Supp. 3d 141, 161 (E.D.N.Y. 2016) ("The Second Circuit has held that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness, unless the circumstances raise doubt as to the person's

### f.  Malicious prosecution federal and state claims

Defendants argue that the Court should grant their motion for summary judgment as to Plaintiff's malicious prosecution claims because Detective Danzinger had probable cause to arrest Plaintiff and "so long as there exists probable cause to arrest, there is probable cause to prosecute. . . ."  (Defs. Mem. 11.)  In support of this argument, Defendants rely on the same arguments made in support of probable cause as to Plaintiff's false arrest claim.  (*Id*.)  In addition, Defendants argue that "[P]laintiff cannot show that [Officer] Donnelly initiated the criminal proceeding against him, given the criminal court complaint was signed by Detective Danzinger."  (*Id*.)

Plaintiff argues that "there are issues of fact as to whether or not probable cause ever arose in this matter," and, as argued with respect to his false arrest claim, "an issue of fact exists as to whether probable cause . . . dissipate[ed] enough to create a duty on behalf of Detective Danzinger to either void the arrest or inform the prosecutor of the issue."  (Pl. Opp'n 8–9.) Plaintiff's malicious prosecution claim appears to be based on his allegations that Defendants

---

veracity." (internal quotations omitted) (quoting *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006))).

   Lastly, Detective Danzinger had probable cause to arrest Plaintiff for criminal trespass in the third degree.  Under section 140.10(a) of the New York Penal Law, a person is guilty of criminal trespass in the third degree when: "he knowingly enters or remains unlawfully in a building or upon real property . . . (a) which is fenced or otherwise enclosed in a manner designed to exclude intruders . . . ."  N.Y.P.L. § 140.10(a).  Deluca reported to Detective Danzinger that she saw two perpetrators walk on to the Curulli home and enter the shed in the backyard, (Defs. 56.1 ¶¶ 2–3), and she did not give them permission to enter the property, (Deluca Dep. 106).  Based upon the information Detective Danzinger received from the eyewitness, it was reasonable for Detective Danzinger to believe that Plaintiff had committed the crime of criminal trespass in the third degree.  *Marcano v. City of Schenectady*, 38 F. Supp. 3d 238, 259 (N.D.N.Y. 2014) (finding that the arresting officers had probable cause to arrest the plaintiff for criminal trespass where the plaintiff ran through various backyard and jumped over at least one chain-link fence).

failed to investigate his alibi and did not inquire further into Plaintiff's claims that he was out of town at the time of the May 2014 Incident. (*Id*. at 8.)

"[F]ederal law defines the elements of a §1983 malicious prosecution claim, and . . . a State's tort law serves only as a source of persuasive authority rather than binding precedent in defining these elements."[23] *Lanning*, 908 F.3d at 25.

In a claim for malicious prosecution under section 1983, the plaintiff must show "that there was . . . a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000); *see also Coleman v. City of New York*, 688 F. App'x 56, 58 n.1 (2d Cir. 2017) ("The tort of malicious prosecution relates to deprivations of liberty pursuant to legal process — meaning either post-arraignment or as a result of [an] arrest pursuant to warrant." (citing *Singer*, 63 F.3d at 116–17)). "In order to prevail on [a malicious prosecution] claim under . . . Section 1983 . . . a plaintiff is required to demonstrate (i) the commencement or continuation of a criminal proceeding against [him]; (ii) the termination of the proceeding in [his] favor; (iii) that there was no probable cause for the proceeding; and (iv) that the proceeding was instituted with malice." *Mitchell v. City of*

---

[23]  The Second Circuit has held that the elements of state and federal malicious prosecution claims are substantially the same. *See Boyd v. City of New York*, 336 F.3d 72, 75 (2d Cir. 2003) ("The elements of . . . malicious prosecution under § 1983 are substantially the same as the elements under New York law. Therefore, the analysis of the state and the federal claims is identical." (citation and internal quotation marks omitted)); *see also Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003).  However, the Second Circuit recently clarified that "a state's tort law serves only as a source of persuasive authority rather than binding precedent in defining these elements," and therefore the Second Circuit's decisions requiring affirmative indications of innocence with respect to "favorable termination" govern section 1983 claims, regardless of developments in New York State malicious prosecution law. *Lanning*, 908 F.3d at 25.  Because the Court dismisses Plaintiff's claim with respect to the probable cause element which is consistent under federal and state law, and not with respect to the favorable termination element, the Court discusses the state and federal malicious prosecution claims against Detective Danzinger together.

*New York*, 841 F.3d 72, 79 (2d Cir. 2016); *see Lanning*, 908 F.3d at 25 (stating that to prevail on

a section 1983 claim a plaintiff is required to show "a seizure or other perversion of proper legal

procedures implicating [his] personal liberty and private interests under the Fourth Amendment,"

and that the "criminal proceedings were initiated or continued against him, with malice and

without probable cause, and were terminated in his favor").  The elements of malicious

prosecution under New York law are substantially the same.  *See Morris v. Silvestre*, 604 F.

App'x 22, 24 (2d Cir. 2015) ("The elements of a claim for malicious prosecution in New York

are (1) the initiation or continuation of a criminal proceeding against [the] plaintiff;

(2) termination of the proceeding in [the] plaintiff's favor; (3) lack of probable cause for

commencing the proceeding; and (4) actual malice as a motivation for [the] defendant's actions."

(citing *Manganiello*, 612 F.3d at 161)).  However, under section 1983, a plaintiff is required to

show an "affirmative indication[] of innocence to establish 'favorable termination,' *see Lanning*,

908 F.3d at 25, and under state law, the favorable termination element is satisfied "so long as the

final termination of the criminal proceeding is not inconsistent with the [p]laintiff's innocence,"

*id.* (citing *Penree v. City of Utica*, 13-CV-01323, 2016 WL 915252, at *17 (N.D.N.Y. Mar. 4,

2016)).

Because the lack of probable cause is an element of a malicious prosecution claim, "the

existence of probable cause is a complete defense to a claim of malicious prosecution."  *Keith v.

City of New York*, 641 F. App'x 63, 67 (2d Cir. 2016) (first quoting *Stansbury*, 721 F.3d at 90;

and then citing *Torres*, 26 N.Y.3d at 761); *Morris*, 604 F. App'x at 25 (stating that a court must

separately analyze "the charges claimed to have been maliciously prosecuted" to determine

whether there was probable cause for the prosecution of each charge) (quoting *Posr v.

Doherty*, 944 F.2d 91, 100 (2d Cir. 1991)); *Posr*, 944 F.2d at 100 (holding that it was error for

the district court to not discuss whether there was probable cause as to more serious crimes involving different elements). The existence of probable cause in a malicious prosecution suit is determined at the time the prosecution is commenced, *Rothstein v. Carriere*, 373 F.3d 275, 292 (2d Cir. 2004), and is marginally higher than the standard in false arrest cases in that it requires "such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff [is] guilty," *Stansbury*, 721 F.3d at 95 (citation omitted).

The Court finds that there was probable cause to prosecute Plaintiff for Burglary in the Third Degree, Petit Larceny, Criminal Possession of Stolen Property in the Fifth Degree, and Criminal Trespass in the Third Degree, for substantially the same reasons discussed above. Even though the standard for probable cause in the context of a malicious prosecution claim is "slightly higher" than the standard for a false arrest claim, a victim's identification of the alleged perpetrator and description of the alleged conduct is generally sufficient to support probable cause and defeat a malicious prosecution claim in the absence of any facts dissipating probable cause after an arrest. *See Keith*, 641 F. App'x at 67 ("Although the probable cause standard in the malicious prosecution context is slightly higher than the standard for false arrest cases, information from an identified citizen accusing another individual of the commission of a specific crime is [generally still] sufficient to provide the police with probable cause." (citations and internal quotation marks omitted) (collecting cases)).

### i. Probable cause was not dissipated after Plaintiff's arrest

Plaintiff argues that issues of fact exist as to whether probable cause dissipated after Detective Danzinger "became aware from multiple sources that Plaintiff was not present in the state at the time of the incident," (Pl. Opp'n 8), and if it did, "did it dissipate enough to create a duty on behalf of [D]etective Danzinger to either void the arrest or inform the prosecutor of the

43

issue," (*id.* at 8–9). As argued with respect to his false arrest claim, Plaintiff also argues that

Detective Danzinger's claim that he called "the hotel in Maryland in a failed attempt to verify

[P]laintiff's claims . . ." (*id.* at 8), demonstrates that Detective Danzinger was aware of Plaintiff's

claims of being out of state and that "there is an issue of fact as to whether "[D]etective

Danzinger disregarded this fact," (*id.* at 5).

  The Second Circuit has "not often considered dissipation in the context of new

information emerging *after* a warrantless arrest based on probable cause." *United States v.

Pabon*, 871 F.3d 164, 176 (2d Cir. 2017), *cert. denied*, --- U.S. ---, ---, 139 S. Ct. 61 (2018). In

*Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996), the Second Circuit

"suggest[ed] that a section 1983 malicious prosecution claim may lie where an officer

affirmatively continues processing a defendant's case after the groundless nature of the charges

has become apparent." *Pabon*, 871 F.3d at 177 (quoting *Lowth*, 82 F.3d at 571); *see Kent v.

Thomas*, 464 F. App'x 23, 25 (2d Cir. 2012) ("[U]nder New York law, even when probable

cause is present at the time of arrest, evidence could later surface which would eliminate that

probable cause." (quoting *Lowth*, 82 F.3d at 571.)) While reserving decision on this issue, the

Second Circuit in *Pabon* explained that:

    In the often crucial hours after an arrest, the police and other law
    enforcement officers may be required to trace multiple developing
    leads at any given time, with each new piece of information
    supporting probable cause, or sometimes running counter to it.
    Given the fluidity purposely built into the probable cause standard,
    requiring officers continually to make moment-to-moment
    assessments of probable cause could misallocate limited police
    resources and even undermine the framework . . . which provides
    for a prompt determination by a magistrate whether probable cause
    exists 'as a prerequisite to extended restraint of liberty.

*Pabon*, 871 F.3d at 176 (citing *Peet v. City of Detroit*, 502 F.3d 557, 565 (6th Cir. 2007)); *see

Peet*, 502 F.3d at 565 (noting that a "court-imposed requirement" of ongoing revaluation of

probable cause could result in "some released suspects being rearrested when further inculpatory evidence emerged," even multiple times).

In the context of malicious prosecution, many district courts in this Circuit have not only found that probable cause to prosecute may dissipate when police officers uncover new evidence after an arrest, but also where a police officer fails to examine evidence available to them. *See Lanning v. City of Glens Falls*, No. 16-CV-00132, 2017 WL 922058, at *3 (N.D.N.Y. Mar. 8, 2017) ("The question is whether either the evidence gathered after arrest undermined a finding of probable cause, or whether the defendants' inquiry into the alleged crime so far departed from what a reasonable person would have undertaken as to itself constitute evidence of lack of probable cause") (citing *Rae v. County of Suffolk*, 693 F. Supp. 2d 217, 227 (E.D.N.Y. 2010)), *aff'd*, 908 F.3d 19 (2d Cir. 2018); *see also Butler v. Hesch*, 286 F. Supp. 3d 337, 360 (N.D.N.Y. 2018) ("The New York Court of Appeals has noted that 'the failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause.'" (quoting *Lowth*, 82 F.3d at 571)); *DaCosta v. Tranchina*, 281 F. Supp. 3d 291, 300 (E.D.N.Y. 2017) (same). While defendants are not obliged to exonerate [a] plaintiff or uncover exculpatory evidence, . . . the 'failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause.'" *Burgess v. DeJoseph*, No. 14-CV-1371, 2017 WL 1066662, at *6 (N.D.N.Y. Mar. 21, 2017) (citations omitted), *aff'd*, 725 F. App'x 36 (2d Cir. 2018). Indeed, the Second Circuit in *Lowth* also noted that "the failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause." *Lowth*, 82 F.3d at 571 (internal citations and quotation marks omitted).

Under the circumstances of this case where there is no evidence of fraud[24] or that Detective Danzinger suppressed evidence, Plaintiff's claim that probable cause dissipated after Detective Danzinger "became aware from multiple sources that Plaintiff was not present in the state at the time of the incident," fails because Detective Danzinger, having established probable cause, was under no obligation to investigate Plaintiff's alibis and defenses. *See Sorrell v. Cty. of Nassau*, 162 F. Supp. 3d 156, 169–70 (E.D.N.Y. 2016) ("The mere assertion of an alibi, and even the failure to investigate such an alibi to plaintiff's satisfaction, does not overcome the existence of probable cause to prosecute where there is no evidence of fraud or suppression of evidence."); *see also Candelario v. City of New York*, No. 12-CV-1206, 2013 WL 1339102, at *7 (S.D.N.Y. Apr. 3, 2013) (same) (quoting *Dukes v. City of New York*, 879 F. Supp. at 335, 343), *aff'd*, 539 F. App'x 17 (2d Cir. 2013); *Crawford v. City of New York*, No. 05-CV-5358, 2011 WL 13175925, at *14 (E.D.N.Y. Feb. 28, 2011) (granting summary judgment as to the plaintiff's malicious prosecution claim although the plaintiff alleged that he informed the arresting officers that he was at work during the alleged crime because the officers "were under no obligation to investigate plausible claims of innocence"); *Drummond v. Castro*, 522 F. Supp. 2d 667, 678 (S.D.N.Y. 2007) (granting summary judgment to defendants on malicious prosecution claim because police had probable cause to arrest plaintiff, and plaintiff's alibi and character reference from employer did not defeat probable cause). Further, Detective Danzinger was not provided with any conclusive evidence of Plaintiff's alibi. *See Crawford*, 2011 WL 13175925, at *14

---

[24] *See Candelario v. City of New York*, No. 12-CV-1206, 2013 WL 1339102, at *8 (S.D.N.Y. Apr. 3, 2013), *aff'd*, 539 F. App'x 17 (2d Cir. 2013) (stating that the presumption of probable cause may be overcome by evidence establishing that police officers made an incomplete statement of facts to the grand jury or district, misrepresented or falsified evidence, or withheld evidence or otherwise acted in bath faith).

(stating that an arresting officer may not disregard a known, conclusive alibi); *Crews v. County of Nassau*, No. 06-CV-2610, 2007 WL 4591325, at *9 (refusing to dismiss a malicious prosecution claim based on allegations that defendants knew plaintiff was innocent, in part because he was in jail on date of robbery for which they prosecuted him and after arraignment).

Even though Detective Danzinger had no obligation to investigate Plaintiff's alibi, he attempted to do so by calling the hotel where Plaintiff claims he stayed while out of town. (Danzinger Dep. 137:14–17.)  In addition, although Keane testified at his deposition that he offered Detective Danzinger the name and telephone number of an employee at the restaurant where he and Plaintiff ate during the May 2014 Incident and informed Detective Danzinger that the restaurant had video footage to support Plaintiff's alibi, this did not dissipate probable cause because Detective Danzinger did not have the video footage in his possession to verify Plaintiff's claim. *Cf. Weiner v. McKeefery*, 90 F. Supp. 3d 17, 32 (2015) (dismissing defendants' motion for summary judgment as to the plaintiff's malicious prosecution case where an officer refused to review an exculpatory recording that the plaintiff provided to the police officers at the time of his arrest); *see also De Santis v. City of New York*, No. 10-CV-3508, 2011 WL 4005331, *8 (S.D.N.Y. Aug. 29, 2011) ("The only additional facts [the plaintiff] has identified are email messages and [the witnesses'] telephone records . . . Although this information could have later been used to cast doubt on [the witness'] credibility, it was not available to the [arresting officer] at the time he completed his sworn statement thus did not vitiate probable cause.").

Plaintiff argues that Detective Danzinger's claim that he called "the hotel in Maryland in a failed attempt to verify [P]laintiff's claims . . ." (Pl. Opp'n 6), demonstrates that Detective Danzinger was aware of Plaintiff's claims of being out of state and that "there is an issue of fact as to whether "[D]etective Danzinger disregarded this fact," (*Id.* at 5).  Plaintiff also argues that

although Detective Danzinger had no duty to "investigate his defenses or his unverified claims of justification offered," Detective Danzinger was "not permitted to deliberately disregard facts that establish justification." (Pl. Opp'n 5–6) (citing *Prevost v. City of New York*, 13-CV-3760, 2014 WL 6907560, at *1 (S.D.N.Y. Dec. 9, 2014)). However, there is no evidence that Detective Danzinger disregarded any facts; indeed, the evidence demonstrates that he did not disregard this fact as the district attorney was made aware that Plaintiff alleged that he was in Ocean City, Maryland during the May 2014 Incident. (R. La Tour Dep. 16.)

Detective Danzinger testified that when he called the hotel in Maryland, the hotel employee he spoke with told him that they did not know Plaintiff and they did not know about any video footage. (Danzinger Dep. 137: 14–17.) Further, when Detective Danzinger requested a hotel receipt showing that Plaintiff stayed at the hotel, he was told by the employee that "they couldn't supply [him] with any information," over the telephone. (Danzinger Dep. 139.) Thus, Detective Danzinger was unable to verify Plaintiff's claims and therefore did not receive any relevant information that may have dissipated probable cause.

Moreover, Detective Danzinger was under no obligation to conduct an investigation into Plaintiff's whereabouts at the time of the alleged crime nor was he required to inquire further into Plaintiff's whereabouts after calling the hotel in Maryland.[25] *See Locovello*, 701 F. App'x at 73 ("Once officers possess facts sufficient to establish probable cause, they are neither required nor allowed to sit as prosecutor, judge or jury. Their function is to apprehend those suspected of wrongdoing, and not to finally determine guilt through a weighing of the evidence." (quoting *Krause v. Bennett*, 887 F.2d 362, 372 (2d Cir. 1989))); *see also Poux v. County of Suffolk*, 2012

---

[25] Plaintiff has not presented any evidence to suggest that Detective Danzinger was involved with his case after signing the criminal complaint on May 3, 2014.

WL 1020302, at *26 (E.D.N.Y. 2012) ("[A] claim that a law enforcement officer could have done a more thorough investigation, or even that the officer made mistakes in conducting an investigation, is insufficient to establish a cause of action for malicious prosecution.").

For the foregoing reasons, the Court grants Defendants' motion for summary judgment as to Plaintiff's section 1983 and state law malicious prosecution claims.

### f. Section 1983 denial of a right to a fair trial claim

Plaintiff argues that Defendants violated his right to a fair trial by knowingly submitting fabricated evidence to the District Attorney's Office and withholding "actual information from prosecutors that [P]laintiff was innocent of the crime." (Compl. ¶¶ 48–51.) In particular, Plaintiff argues that Defendant Danzinger (1) "withheld exculpatory evidence from the District Attorney's office by discarding the photo[graph] that Ms. Deluca took of the backs of the men who visited [the Curulli home]," during the May 2014 Incident, (2) "knew that Plaintiff could not have committed the alleged crime and withheld that information from the District Attorney's Office," and (3) "misled the prosecutor in informing the prosecutor that Ms. Deluca had picked [Plaintiff] out of the lineup rather than the filler that she testified at the deposition that she identified." (Pl. Opp'n 10.)

Defendants argue that "the record is devoid of any evidence that any officer fabricated evidence." (Defs. Mem. 13.) In addition, Defendants argue "that none of the information provided in the criminal court complaint to the Staten Island District Attorney's Office was untrue and that the undisputed facts show that Detective Danzinger was not in possession of any evidence of [P]laintiff's purported innocence that he did not forward to the District Attorney's Office." (*Id*. at 14.)

To establish a fair trial claim based on fabrication of evidence, a plaintiff must show that

"an (1) investigating official (2) fabricates evidence (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result." *Ganek v. Leibowitz*, 874 F.3d 73, 90 (2d Cir. 2017) (quoting *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 277 (2d Cir. 2016)); *see Soomro v. City of New York*, 739 F. App'x 51, 54 (2d Cir. 2018) ("In order to succeed on a claim for a denial of the right to a fair trial against a police officer based on an allegation that the officer falsified information, an arrestee must prove by a preponderance of the evidence that the officer created false information, the officer forwarded the false information to prosecutors, and the false information was *likely* to influence a jury's decision." (citing *Garnett*, 838 F.3d at 277)); *see also Bellamy v City of New York*, 914 F.3d 727, 745 (2d Cir. 2019) ("When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial." (quoting *Ricciuti v N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997))).

Fabrication of evidence by omission is one way to establish a fabrication of evidence claim and it does not duplicate a plaintiff's malicious prosecution claims. *See Garnett*, 838 F.3d at 278 (rejecting an argument that a "claim based on falsified information is only cognizable as a claim for malicious prosecution or for false arrest under the Fourth Amendment, and not as an independent fair trial claim"); *Morse v. Fusto*, 804 F.3d 538, 548 (2d Cir. 2015) ("Information may be 'false' if material omissions render an otherwise true statement false.")

To satisfy the third element, the fabricated evidence need not actually reach a jury. The Second Circuit only requires a showing that the fabricated evidence "would have been likely to influence the jury's decision." *Greene v. City of New York*, 742 F. App'x 532, 534 (2d Cir. 2018) (quoting *Ricciuti*, 124 F. 3d at 130). Unlike a false arrest or malicious prosecution claim,

"probable cause is not a defense to a claim for a denial of the right to a fair trial" based on the fabrication of evidence. *Garnett*, 838 F.3d at 277 (alteration omitted) (citing *Jovanovic v. City of New York*, 486 F. App'x 149, 152 (2d Cir. 2012)).

The parties agree that Detective Danzinger signed the criminal complaint and filed the arrest report, (Defs. 56.1 ¶ 32; Pl. Resp. 56.1 ¶ 32), thus Detective Danzinger is an investigating official. However, Plaintiff fails to provide any evidence to support his claim that Detective Danzinger knowingly forwarded material false information to the prosecution or withheld exculpatory evidence from the District Attorney.

First, as discussed above, Plaintiff has not produced any evidence that suggests that Defendant Danzinger was ever in possession of the photograph of the backs of the perpetrators that Ms. Deluca took during the May 2014 Incident. In addition, Detective Danzinger only had a statement from Plaintiff and Keane that Plaintiff was in Ocean City, Maryland on the date of the May 2014 Incident. (Def. 56.1 ¶ 25; Danzinger Dep. 88: 9–12, 142:14–17; Richard Keane Dep.13–14, annexed to Pl. Mot. as Ex. E, Docket Entry No. 65-5.) Detective Danzinger had no physical proof to support their statements. Further, Detective Danzinger gave Plaintiff "the benefit of the doubt," and called the hotel in Maryland to corroborate Plaintiff's alibi, (Danzinger Dep. 136–140), but was unable to confirm whether the hotel had video footage and was not able to obtain a copy of a receipt from Plaintiff's hotel stay, (Danzinger Dep. 137: 14–17, 139).

As to Plaintiff's theory that Detective Danzinger knew that Plaintiff was out of town based upon his conversations with Keane, the record does not establish that Detective Danzinger had any knowledge (other than the statements of Plaintiff and Keane) of Plaintiff's whereabouts at the time of the May 2014 Incident when he submitted the criminal complaint to the District Attorney's office. Further, the District Attorney was provided with a file that included Plaintiff's

statement to the police explaining that he was out of town in Ocean City, Maryland during the time of the May 2014 Incident. (R. La Tour Dep. 16.) Thus, contrary to Plaintiff's claim, Detective Danzinger did not withhold exculpatory information from the District Attorney. Further, while Plaintiff's friend, Keane, spoke with Detective Danzinger at the Precinct and told him that Plaintiff was in Maryland during the time of the May 2014 Incident, Detective Danzinger had no additional evidence to corroborate Keane's assertion.

Plaintiff attempts to suggest that Detective Danzinger acknowledged that he knew Plaintiff was out of town when Detective Danzinger allegedly told Keane "I know but there's nothing I can do about it," (Keane Dep. 14), in response to Keane's assertion that Plaintiff was out of town. Although Detective Danzinger testified that he never made this statement, (Danzinger Dep. 95), accepting Plaintiff's assertion as true, the alleged statement is not an acknowledgement that Detective Danzinger knew that Plaintiff was out of town, rather, at most, it is an acknowledgement that he knew that both Plaintiff and Keane were asserting that Plaintiff was out of town. As such, Detective Danzinger and Keane's conversation is not sufficient evidence to support Plaintiff's claim that Detective Danzinger was aware of Plaintiff's whereabouts during the May 2014 incident. Without more, Plaintiff's claim that Detective Danzinger omitted facts about Plaintiff's whereabouts from the information sent to the District Attorney's Office fails. *See Creighton*, 2017 WL 636415, at *32 ("Having deposed the [confidential informant], [the] [d]etective, and countless other witnesses over the past three years, the [p]laintiff must now come forward with evidence to support his claims of fabrication. That he has not done, and speculation and innuendo are not sufficient to defeat summary judgment." (alterations and internal quotation marks omitted)).

Plaintiff's claim that Detective Danzinger "misled the prosecutor. . . by informing the

prosecutor that Ms. Deluca had picked [Plaintiff] out of the lineup rather than the filler that she

testified at deposition that she identified," (Pl. Opp'n 11), lacks merit. Deluca corrected her

deposition testimony with respect to whom she identified from the lineup on May 2, 2014.

(Deluca Dep. 113.) Further, numerous police reports from Plaintiff's May 2, 2014 arrest confirm

that Deluca identified Plaintiff from the lineup. (*See* Complaint Follow Up Informational

Report; Lineup Administration Report.) Plaintiff's attempt to rely on a mistake during a

deposition years after the May 2014 Incident (that was later corrected) is insufficient to support

his fabrication of evidence claim. As a result, the Court dismisses Plaintiff's section 1983 denial

of a right to a fair trial claim.[26]

### g. Intentional and negligent infliction of emotional distress and respondeat superior claims

Defendants also moved for summary judgment as to Plaintiff's state law claims for

intentional and negligent infliction of emotional distress and *respondeat superior* liability against

the City. (Defs. Mem. 22–25.) Plaintiff failed to respond to Defendants' arguments.

Plaintiff has abandoned his intentional and negligent infliction of emotional distress

---

[26] Plaintiff has also failed to establish his municipal liability claims pursuant to *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). Plaintiff offers only conclusory allegations of policies and or customs of the City and its "failure to inadequately supervise and train its officers." (SAC 8–11, 15–16.) Plaintiff has not identified any official policy or custom of the City that led to any of the alleged constitutional violations nor has he provided any evidence in support of his claim. *Rothbein v. City of New York*, No. 18-CV-5106, 2019 WL 977878, at *3 (S.D.N.Y. Feb. 28, 2019) (dismissing the plaintiff's section 1983 claims against the Department of Education because the plaintiff failed to allege an official policy or custom upon which her section 1983 claims against the DOE could be found). In addition, because none of Plaintiff's underlying constitutional claims survive, the Court dismisses Plaintiff's *Monell* claims. *See Hirsch v. New York*, No. 18-CV-0405, 2018 WL 4846523, at *2 (2d Cir. Oct. 4, 2018) ("Because the district court properly found no underlying constitutional violation, its decision not address the municipal defendants' liability under *Monell* was entirely correct." (citing *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006)).

claims and *respondeat superior* liability claims. The Court therefore grants Defendants' motion for summary judgment as to those claims. *See Abrahams v. Young & Rubicam Inc.*, 79 F.3d 234, 237 n.2 (2d Cir. 1996) ("Given [the plaintiff's] representations to the district court . . . and the failure to make pertinent arguments here, we deem the claims waived."); *Ying Li v. City of New York*, No. 15-CV-1599, 2017 WL 1208422, at *34 (E.D.N.Y. Mar. 31, 2017) ("Not only does Plaintiff fail to respond to this argument, she does not discuss this claim at all, and therefore abandons it." (citations omitted)); *Innov. Ventures, LLC v. Ultimate One Distrib. Corp.*, No. 12-CV-5354, 2014 WL 1311979, at *9 (E.D.N.Y. Mar. 28, 2014) ("A plaintiff effectively concedes a defendant's arguments by his failure to respond to them.").

### h. Claims against John and Jane Doe Defendants

Defendants Police Officers John/Jane Does #1-3 have not appeared in this action since Plaintiff filed his Complaint on June 25, 2016. (Compl.) Further, the Court has not received any indication that Plaintiff has tried to identify John/Jane Does #1-3. The Court finds that Plaintiff has had sufficient time and opportunity to identify John/Jane Does #1-3, and therefore the Court *sua sponte* dismisses all claims against them. *See Engles v. Jones*, No. 13-CV-6461, 2018 WL 6832085, at *11 (W.D.N.Y. Dec. 28, 2018) ("Dismissal of claims against John Doe defendants is appropriate where a plaintiff has had ample time and opportunity to discover the identity of the John Doe [d]efendants and serve them but has failed to do so." (citation and internal quotations omitted)); *see also Abujayyab v. City of New York*, No. 15-CV-10080, 2018 WL 3978122, at *4 (S.D.N.Y. Aug. 20, 2018) ("When, at the close of discovery, [the] plaintiff has had ample time to identify the John Doe defendant but has failed to do so, the plaintiff simply cannot continue to maintain a suit against the John Doe defendant." (citation and internal quotation marks omitted)); *Ellington v. Cty. of Monroe*, No. 15-CV-6310, 2018 WL 6605662, at *3 (W.D.N.Y. Dec. 17,

2018) (dismissing case against John Does 1 through 12 because [the] [p]laintiff failed to identify them after three years of filing his complaint); *Coward v. Town & Vill. of Harrison*, 665 F. Supp. 2d 281, 300–01 (S.D.N.Y. 2009) (dismissing claims against John Doe defendants because the plaintiff was unable to identify them after five years of filing the complaint).

### III. Conclusion

For the foregoing reasons, the Court grants Defendants' motion for summary judgment and dismiss Plaintiff's claims. The Clerk of Court is directed to close this case.

Dated: March 30, 2019
      Brooklyn, New York

SO ORDERED:

\_\_\_\_\_s/ MKB_____
MARGO K. BRODIE
United States District Judge
